# EXHIBIT A

Robert S. Rosing (#14866)
Jared C. Bowman (#11199)
Cade W. Whitney (#16345)
**ROSING DAVIDSON FROST**
136 Heber Ave., Suite 205
Park City, Utah 84060
Telephone: (435) 731-5451
rosing@rosingdavidson.com
bowman@rosingdavidson.com
whitney@rosingdavidson.com
*Attorneys for Plaintiffs Ryan F. Jacob and Anne Jacob*

> **If you do not respond to this document within applicable time limits, judgment could be entered against you as requested.**

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SUMMIT COUNTY, STATE OF UTAH

| | |
|---|---|
| **RYAN F. JACOB**, an individual, **ANNE JACOB,** an individual, **RYAN F. JACOB & ANNE JACOB AS REPRESENTATIVES OF G.J.**, as minor child.<br><br>Plaintiffs,<br><br>vs.<br><br>**AMERICAN FLAG HOMEOWNERS' ASSOCIATION,** A Utah non-profit corporation,<br><br>Defendant. | **VERIFIED COMPLAINT**<br>**&**<br>**JURY DEMAND**<br><br>Case No: _____<br><br>Judge _____<br><br>**TIER III** |

Plaintiffs Ryan F. Jacob, Anne Jacob, for themselves and as representatives of their minor child, G.J., by and through counsel and pursuant to Rule 8 of the Utah Rules of Civil Procedure, hereby complain and allege against defendant American Flag Homeowners Association as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Ryan F. Jacob is an individual who resides in Summit County, State of Utah.

2. Plaintiff Anne Jacob is an individual who resides in Summit County, State of Utah.

3. Plaintiff G.J. is the minor child of Ryan F. and Anne Jacob, and resides with them in Summit County, State of Utah.

4. Plaintiffs Ryan F. Jacob, Anne Jacob, and G.J. are hereby collectively known hereafter as the "Jacobs."

5. Defendant American Flag Homeowners Association (the "Association") is a Utah non-profit corporation with a principal place of business in Summit County, State of Utah.

6. This Court has jurisdiction pursuant to 42 U.S.C. § 3613(a)(1) and UTAH CODE § 78A-5-102(1).

7. This Court is the proper venue to adjudicate this matter pursuant to UTAH CODE §§ 78B-3a-201(1)(a), 78B-3a-202(1), 78B-3a-205(2).

## GENERAL ALLEGATIONS

### I. BACKGROUND

8. The Jacobs own real property located at 429 Centennial Circle, Park City, UT 84060 ("Property").

9. The Association is a nonprofit corporation formed pursuant to UTAH CODE §§ 16-6a-101 *et seq*. (the "Nonprofit Act").

10. The Association is the homeowners' association for the Property.

11. The Association is subject to the Utah Community Association Act, which is codified as UTAH CODE §§ 57-8a-101 *et seq*. (the "Act"), and which includes provisions related to the fining of owners.

12. Section 57-8a-208(3) of the Act specifically requires that any fine against a member:

(a) be made only for a violation of a rule, covenant, condition, or restriction that is in the association's governing documents;

(b) be in the amount provided for in the association's governing documents; and

(c) accrue interest and late fees as provided in the association's governing documents.

UTAH CODE § 57-8a-208(3).

13. Under the Act, an association may not impose fines retroactively. *See* UTAH CODE § 57-8a-208(1-3).

14. An association must offer the owner being fined the opportunity to request a hearing, before the association's board, to dispute the fine. *See id.* at (4)(a).

15. Issuance of a subsequent fine for a continuing violation can only be done if the violation continues for more than 10 days. *See id.* at (2)(c).

16. The fines issued by an association must be reasonable. *See* UTAH CODE § 57-8a-218(23).

17. Rules and regulations must also be adopted pursuant to the requirements outlined in UTAH CODE § 57-8a-217.

18. The Federal Fair Housing Act ("FFHA") and the Utah Fair Housing Act ("UFHA") (collectively, the "FHA") also bind the Association.

19. Under the FHA a disability is defined in part as "a physical or mental impairment that substantially limits one or more of a person's major life activities." 42 U.S.C. § 3602(h); UTAH CODE § 57-21-2(10)(a).

20. The FHA requires the Association to make reasonable accommodations for disabled persons. *See* 42 U.S.C. § 3604; UTAH CODE § 57-21-5(4)

21. The FFHA allows an aggrieved party to recover actual and punitive damages. *See* 42 U.S.C. § 3613(c).

22. The UFHA also allows for the award of actual and punitive damages. *See* UTAH CODE § 57-21-12(7)(b).

23. Both the FFHA and the UFHA allow the recovery of attorney fees and costs. 42 U.S.C. § 3613(c)(2); UTAH CODE § 57-21-12(7)(b).

24. The Association and its members are also subject to and bound by the Declaration of Protective Covenants for American Flag Subdivision and amendments thereto ("Declaration"). *See generally* Declaration (**Ex. A**).

25. The Declaration requires owners who want to improve their property to obtain permission from the Association's Architectural Committee ("ARC"). *See id.* at § 4.2.

26. The Declaration also requires the owners to submit plans and specifications to ARC. *See id.*

27. If the ARC fails to take action within 45 days of submittal, the plans are deemed approved. *See id*.

28. The ARC must act intelligently, ascertain if the landscaping and architecture conform to architectural guidelines, use its best judgment to see that all improvements,

4

construction, landscaping, and alterations conform and harmonize with the natural surroundings, existing structures, and disapprove of any incomplete plans. *See id.* at §§ 4.2, 4.4-4.6.

29.     Before an association's board may change rules governing the association, the Act requires: (a) 15-day prior written notice to all the lot owners of the meeting to consider changing the rules; (b) an open forum at the board meeting for lot owners to be heard before adopting the change to the rules; and (c) delivery of a copy of the changed rules to each lot owner within 15 days of the meeting. *See* UTAH CODE §57-8a-217(2).

30.     Upon information and belief, the Association failed to fulfill the Act's requirements before it adopted the 2022 American Flag Subdivision Rules and Regulations (the "Rules"). *See generally* Rules (**Ex. B**).

31.     Regarding fines that the Association imposes on the members of the Association, the Rules state:

> Fines. Fines levied against an Owner by the Association for violations of the Governing Documents shall comply with the provisions of §57-8-208 of the Utah Community Association Act. The Association may levy a fine of up to $100 per day for continuing violations of prohibited acts outlined in the Governing Documents.

Rules at 2.

## II.     THE ASSOCIATION'S APPROVAL OF THE JACOBS' PLANS.

32.     The Jacobs' seven (7) year old son, G.J., has Angelman Syndrome, a genetic disorder that impacts his ability to walk, his speech, and creates an increased risk of seizures.

33.     G.J.'s disability impacted and delayed his ability to walk, and he is unable to play with neurotypical children.

34.     Consequently, the Jacobs sought to construct a family play area where their son could safely play.

35.     On May 26, 2025, Anne Jacob contacted the ARC and specifically asked about submitting plans, including four elevation views, for redoing the Property's landscaping, and specifically asked if she was missing anything. *See* Emails between Anne Jacob and Susan Shay, dated May 26, 2025 to June 23, 2025 (**Ex. C**).

36.     On May 30, 2025, the ARC thanked the Jacobs and asked them to fill out and submit an additional form. *See id*.

37.     On June 4, 2025, the Jacobs submitted the completed form and asked if there was anything else that was missing. *See id*.

38.     The ARC never responded that the Jacobs were missing any documents. *See id*.

39.      On June 18, 2025, the Jacobs again followed up with the ARC to make sure it did not need any additional information from the Jacobs. *See id*.

40.     The ARC did not request any additional information, but instead stated that the architect had approved the Jacobs' Plans, and that the ARC was awaiting full approval by the ARC. *See id*.

41.     On June 23, 2025, the Association's ARC formally approved the Jacobs' Plans in writing. *See id*.

42.     On August 6, 2025, the Jacobs submitted an additional application and required documents to ARC, via email from Anne Jacob, with plans and specifications for further renovation of their Property centered on the construction of a playhouse in a tree grove ("Project"). *See* Email from Anne Jacob to Susan Shay, dated August 6, 2025 and Plans ("August 6th Email") (**Ex. D**).

43.     The August 6th Email plainly stated that the purpose of the Project was to construct an area for the Jacob children to play, including, but not limited to, "a play house in a tree grove."

> **From:** Annie Jacob <jacobhouse429@gmail.com>
> **Sent:** Wednesday, August 6, 2025 1:38 PM
> **To:** Susan Shay
> **Subject:** Re: Landscaping
> **Attachments:** Flag Patio Sketch-compressed.pdf
>
> Hey Susan,
>
> We love our new yard and how much we have been able to use it with the upgrades the HOA and city approved!! We love it so much, that we would like to add on!
>
> Do have to file a whole new application and submit a new processing fee, or can we do an addendum to our previous plans/approval. **Basically we are wanting to make a large retaining wall in the front for more grass and flat play space for the kids (much like the current retaining wall, but closer to the street), fence the sunken patio drops, create a small patio in the back, add an external shower, build a play house in a tree grove, and extend our grass**. I have attached the plans below, but let me know if you need me to submit a whole new application!

*Id.* (emphasis added).

44. With the August 6th Email, the Jacobs provided the ARC of the Association with a copy of the Project Plans showing the location of the planned playhouse, which is where that same playhouse is currently located. *See id*.

45. Thus, the August 6th Email and the plans attached thereto each separately put the Association on notice of Jacobs' Plans, including but not limited to the installation of a playhouse. *See id.*

46. The ARC has an extensive review process for proposed plans and specifications, and thus, the Jacobs repeatedly followed up with the ARC regarding the review of their Project Plans, because the Jacobs were eager to create a location for G.J. to play safely. *See* August 2025 Emails (**Ex. E**).

47. However, at no time did the ARC or the Association at large request any additional details regarding the playhouse. *See id*.

48. As a result, the Jacobs believed that no additional documentation was necessary.

7

49. Indeed, given that Section 4.6 of the Declaration requires the ARC to disapprove any plans where documentation is insufficient, the Jacobs were confident that they had submitted all of the documentation the ARC required. *See* Declaration at § 4.6.

50. This was then confirmed on August 29, 2025, when the ARC gave written notice to the Jacobs that the Association's ARC had formally approved the Jacobs' Plans for the Project:

> **From**: Susan Shay <sshaypc@gmail.com>
> **Sent**: Friday, August 29, 2025 8:04 AM
> **To**: Jacob Family House Manager
> **Subject**: Re: Landscaping
> Attachments: 429 Centennial 1.pdf
>
> Annie,
>
> Good morning! **The HOA ARC has approved your landscaping plans** with the suggestion of not having trees so close to your house with current and future fire restrictions.
>
> Attached is the HOA letter for the city in case it needs to be updated.
>
> Best of luck with your landscaping additions, it sure looks great!
>
> Sincerely,
> Susan Shay
> Ptarmigan Property Services

*See* Email from Susan Shay to Jacob Family House Manager, dated August 29, 2025 ("Approval Email") (**Ex. F**) (emphasis added).

51. In fact, the Association's only "suggestion" was "not having trees so close to your house with current and future fire restrictions." *See id.*

52. Prior to the Association's written approval of the Project, the Association never stated any disapproval of or lack of information/documentation regarding G.J.'s playhouse. *See id.*

53. The Association further confirmed its approval by signing the Park City Homeowners Association Notification Verification ("PC Verification") stating that the Jacobs

8

were going to seek a building permit for the Project. *See* PC Verification, dated August 29, 2025 (**Ex. G**).

54.   At no time before issuing the Approval Email or the PC Verification did the Association ever request any additional documents regarding the Jacobs' Plans.

55.   Subsequently, the Jacobs applied for and received approval from the ARC for additional landscaping changes and painting approval.

56.   Given ARC's repeated approval and in reliance thereon, the Jacobs moved forward and began work on the Project based on the approved Plans, including construction of the playhouse.

57.   The project has now been completed at a cost of approximately $300,000.00.

III.   **THE ASSOCIATION'S ATTEMPTED REVOCATION OF ITS APPROVAL OF THE PROJECT.**

58.   On or about January 5, 2026, the Association attempted to improperly and wrongfully revoke the Association's approval of G.J.'s playhouse and demand that the Jacobs now remove it. *See* Letter from Robert E. Boone III, President of the Association, to Ryan and Anne Jacob, dated January 5, 2026 (the "Removal Letter") (**Ex. H**).

59.   The Association took issue with G.J.'s playhouse and falsely claimed it somehow violated Section 4.2 of the Declaration. *See id.*

60.   The Association also falsely claimed that "complete plans and specifications for the subject structure were never submitted to the AF HOA Architectural Committee, and the Committee never approved the Structure." *Id.*

61.   The Association threatened a daily $100.00 fine if the Jacobs did not remove G.J.'s playhouse within 30 days:

9

> Please be advised that if the playhouse is not removed within 30 days, AF HOA has the right to fine you for non-compliance. AF HOA has determined that an appropriate fine will be $100 per day until the playhouse is removed.

*Id.*

62.    The Association suggested moving G.J.'s playhouse to the backyard. *See id.*

63.    But the backyard is neither level nor large enough, and G.J. frequently falls when he goes through it, making it an unsafe area for prolonged playtime.

64.    Further, preparing the backyard for G.J.'s playhouse would require significant earthwork to level the ground and create adequate space for the playhouse, even if possible.

65.    On January 5, 2026, Mr. Jacob responded by pointing out that the Jacobs not only applied for the changes and submitted plans, which expressly included G.J.'s playhouse, but also that the Association approved those plans in writing. *See* Email from Mr. Jacob to Mr. Boone, dated January 5, 2026 (**Ex. I**).

66.    Mr. Jacob attached a copy of the plans that the Jacobs submitted and went on to point out that "No questions about this plan were asked, no clarifying points came back from the ARC. The sufficiency of these plans was never contested by ARC or any other member or body of the HOA." *Id.*

67.    Mr. Jacob then quoted the approval email that the Jacobs received from the ARC and then pointed out that,

> It is in this context that we find your January 5th, 2026 letter to be puzzling and misguided. Firstly, the HOA's bylaws are silent as to what constitutes "complete plans and specifications." However, it is very clearly incumbent on the ARC to review plans, which it did for 23 days, determine their sufficiency, and approve or not approve them on that basis and their conformance with the bylaws and applicable regulations to its knowledge (e.g., knowledge of Deer Valley regulations that it clearly possessed when it decided to approve our plans). The idea that the ARC could approve plans, and then nearly 6 months later reverse itself, after tens of thousands of incurred and paid expense, is simply inconsistent with the law.

*Id.*

10

68.　　Mr. Jacob went on to reiterate that the Jacobs had submitted the plans and the HOA had approved them as follows:

> In this case, our plans were approved without comment, amendment, or concern – this all happened well before construction of the playhouse began. To put this simply: we found your letter to be factually inaccurate as to how this situation arose and is nothing more than an attempt to change decisions the HOA and ARC has already made, well outside of the authority of either. We believe, if we are forced to move our playhouse (although we see no basis for that occurring), the HOA and ARC would be liable for considerable damages, which we would pursue.
>
> To be frank, it seems clear to us that the ARC approved our plans, and regrets doing so, or failed its duties to properly analyze our plans. That, unfortunately, does not provide a basis for reversing its decision.
>
> Please note any attempt to fine our family, given the facts of how this situation has come to be, will be met with legal action.
>
> Thank you for your note, and we very much wish we were not having this conversation with our neighbors and friends. However, this situation is entirely of the HOA's making.

*Id*.

69.　　On January 9, 2026, the Association sent a follow-up letter demanding that the playhouse be removed. *See* Letter from Mr. Boone to Ryan and Anne Jacob, dated January 9, 2026 (the "Demand Letter") (**Ex. J**).

70.　　In the Demand Letter, the Association also incorrectly claimed, via the following, that it could revoke approval of plans:

> I point out that, contrary to Ryan's email, this is not a situation where the ARC members are having "regrets" about approving a playhouse. They cannot have regrets when the notion of a playhouse never entered their minds in the first place while considering your landscaping plans. At best, you may be able to convince a trier-of-fact that the ARC or the HOA's architect committed an oversight, but under Utah law that does not negate the HOA's authority to revoke in good faith an approval based upon a mistake of fact or oversight, and/or require removal of an improvement that detracts from the neighborhood.

*Id.*

11

71.     Neither the Removal Letter nor the Demand Letter provided a basis for the threatened $100.00 daily fine. *See id.* and Removal Letter.

72.     On March 20, 2026, the Association improperly issued a $5,500.00 fine, which it described as the fines from February 4, 2026, through March 30, 2026. *See* Homeowner Transaction History, 1/1/2026 to 4/7/2026 (**Ex. K**).

73.     The Association then began imposing a daily fine of $100.00. *See id.*

74.     Then, on April 5, 2026, the Association had the audacity to improperly make an ACH debit charge to the Jacobs' account without the Jacobs' consent, which was on file for Association Assessments, for $5,900.00. *See id.*

75.     Given this unauthorized charge, the Jacobs fear that the Association will continue to debit their account without any authorization from the Jacobs.

76.     No opportunity was provided for the Jacobs to contest the fine.

77.     The fines issued do not comply with the statutory requirements set forth in the Act for the issuance of fines against the Jacobs.

78.     The Jacobs have been damaged by the Association's action by revocation of their approval of the Project and issuance of retroactive fines that do not comport with the Act.

**FIRST CLAIM FOR RELIEF**
**(DECLARATORY JUDGMENT)**

79.     The Jacobs incorporate all preceding paragraphs by this reference as though fully set forth herein.

80.     The Association is subject to the Act, the Declaration, the FFHA, and the UFHA.

81.     Pursuant to UTAH CODE §§ 78B-6-408 and 78B-6-409, the Jacobs are entitled to a judicial declaration of the following conclusions:

    a.  The manner and amount of the fines that the Association imposed are unlawful;

12

b. The Association cannot retroactively impose fines because each fine must be separately noticed and contain specific statutory information pursuant to UTAH CODE § 57-8a-208;

c. The Association must offer the Jacobs an opportunity to request a hearing before the board before the fines were issued, which the Association did not do pursuant to UTAH CODE § 57-8a-208(2)(a);

d. The issuance of subsequent fines for a continuing violation is allowed only if the violation continues for more than 10 days pursuant to UTAH CODE § 57-8a-208 (2)(c);

e. The Association never provided the required 10-day waiting period before issuing the continuing $100.00 per day fine;

f. The $100.00 daily fine, resulting in a $3,000.00 per month fine, is unreasonable pursuant to UTAH CODE § 57-8a-218(23);

g. The Association's Removal Letter and Demand Letter failed to satisfy the Association's obligation to issue a warning, as neither letter lists the basis for the fine under UTAH CODE § 57-8a-208(3);

h. The Rules were not adopted pursuant to the requirements of UTAH CODE § 57-8a-217, and are therefore invalid;

i. The Association has acted arbitrarily and capriciously against the Jacobs;

j. The Association has inconsistently imposed fines in the past, in violation of the Utah Code, and further impositions of fines will also be arbitrary and capricious;

k. The Association must refund any and all fines assessed to the Jacobs related to this Action;

l.  The Jacobs complied with the Declaration and Rules in submitting the required documents for ARC's consideration of the Project;

m.  On August 29, 2025, the Association approved, in writing, the Jacobs' Project, including the construction of the playhouse;

n.  The Association is estopped from rescinding its approval, and the playhouse may remain where it is, with no changes required;

o.  The Jacobs are entitled to an order declaring that ARC approved the playhouse and does not have to be moved as demanded by the Association;

p.  The FHA requires that the Association grant reasonable accommodations for those who have disabilities pursuant to 42 U.S.C. § 3604 and UTAH CODE § 57-21-5(4);

q.  G.J. qualifies as a disabled person under the FHA;

r.  The Jacobs submitted the Project Plans to the Association to build a play area for G.J. that accommodates his qualified disability;

s.  The Association approved the plans on August 29, 2025, and may not revoke that approval;

t.  The Association refuses to make reasonable accommodation for G.J.'s disability, in violation of the FHA, to allow the playhouse to stay in its current location;

u.  The Jacobs are entitled to an order declaring that leaving the playhouse in its current condition is a reasonable accommodation and that the Association is forbidden from taking any action to have the playhouse removed; and

v.  The Jacobs are entitled to an award of attorney fees pursuant to the FHA and the Declaration.

14

## SECOND CLAIM FOR RELIEF
### (BREACH OF CONTRACT)

82.     The Jacobs incorporate all the preceding paragraphs by this reference as though fully set forth herein.

83.     The Declaration and other Association governing documents constitute a contract between the Jacobs and the Association (collectively, the "Governing Documents Contract").

84.     The Jacobs have fully fulfilled their obligations under the Governing Documents Contract, including but not limited to seeking approval from ARC for the Project, paying the ARC Review Fees, and submitting all of the necessary information and documents.

85.     Section 4.2 of the Declaration sets forth the process by which the ARC reviews and approves or disapproves an owner project.

86.     The Jacobs submitted the necessary documentation, including the Project Plans, to ARC on August 6, 2025.

87.     ARC gave notice of approval of the Project Plans on August 29, 2025, pursuant to the Governing Documents Contract.

88.     The Jacobs, in reasonable reliance, then completed the Project at a cost of approximately $300,000.00.

89.     On January 5, 2026, the Association materially breached the Governing Documents Contract by revoking the approval after the Jacobs had completed the Project and demanded that the Jacobs remove the playhouse.

90.     The Association then materially breached the Governing Documents Contract by issuing a $100.00 a day fine retroactively starting on February 4, 2026, related to the previously approved Project.

91.     The Association's material breaches have proximately caused the Jacobs to suffer injury and harm in an amount to be determined at trial, but currently estimated to be more than $300,000.00.

92.     The Jacobs are entitled to an award of attorney fees and costs pursuant to Section 7.1 of the Declaration.

## THIRD CLAIM FOR RELIEF
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

93.     The Jacobs incorporate all the preceding paragraphs by this reference as though fully set forth herein.

94.     Under Utah law, every contract contains an implied covenant of good faith and fair dealing (the "Implied Covenant") that obligates the parties to refrain from doing anything or refraining from doing anything that would impair the other party's receipt of the fruits of the contract and reasonable expectations .

95.     The Governing Contract Documents contain the Implied Covenant.

96.     The Association materially breached the Implied Covenant by:

   a. Failing to honor the ARC's written approval of the Project;

   b. Attempting to rescind a validly issued approval of the Project, including, but not limited to, the playhouse;

   c. Failing to request additional documentation, if necessary, from the Jacobs before approving the Project;

   d. Failing to notify the Jacobs if any additional documentation was necessary;

   e. Retroactively imposing baseless fines for the Jacobs for alleged non-compliance;

   f. Failing to notify the Jacobs of the basis for any fines;

16

g. Debiting the Jacobs' account for the baseless fines without the Jacobs' authorization;

h. Failing to provide an opportunity to dispute the fines that the Association imposed;

i. Continuing to impose daily fines against the Jacobs; and

j. Demanding the removal of the playhouse.

97. The Association's material breaches of the Implied Covenant have proximately caused the Jacobs to suffer injury and harm in an amount to be determined at trial, but currently estimated to be more than $300,000.00.

98. The Jacobs are entitled to an award of attorney fees and costs pursuant to Section 7.1 of the Declaration.

## FOURTH CLAIM FOR RELIEF
### (ESTOPPEL)

99. The Jacobs incorporate all the preceding paragraphs by this reference as though fully set forth herein.

100. On August 29, 2025, the Association expressly approved the Project in writing.

101. The Jacobs reasonably relied on the Association's approval and acted with prudence by completing the Project at a cost of approximately $300,000.00.

102. The Association knew the Jacobs would rely on the stated approval of the Project and/or that the Association should reasonably have expected such reliance and action.

103. The Association was aware of all material facts, including the Jacobs moving forward and completing the Project.

17

104.    The Jacobs will be injured if the Association is allowed to revoke the Project approval because the Jacobs spent approximately $300,000.00 to complete the Project and will incur thousands of dollars more to remove the playhouse as demanded by the Association.

105.    The Jacobs have been injured in an amount to be determined at trial, but currently estimated to be over $300,000.00.

## FIFTH CLAIM FOR RELIEF
### (FFHA VIOLATION)

106.    The Jacobs incorporate all the preceding paragraphs by this reference as though fully set forth herein.

107.    Ryan F. and Anne Jacob, on behalf of G.J., seek relief under the FFHA.

108.    The FFHA allows a Utah state court to adjudicate federal claims involving the FFHA by an aggrieved person, which G.J. is. *See* 42 U.S.C. § 3613(a)(1).

109.    The Association is bound by the FFHA, in which disability is defined in part as "a physical or mental impairment that substantially limits one or more of a person's major life activities." 42 U.S.C. § 3602(h).

110.    The FFHA requires that the Association grant reasonable accommodations to those with disabilities within the Association. *See* 42 U.S.C. § 3604.

111.    G.J. has Angelman Syndrome, a genetic disorder that impacts his ability to walk, his speech, and creates an increased risk of seizures, and qualifies as a disability under the FFHA.

112.    G.J.'s disability impacted and delayed his ability to walk, and he is unable to play with neurotypical children.

113.    Consequently, the Jacobs sought to construct a family play area where G.J. could safely play, accommodating his disability.

18

114. ARC approved the plans on August 29, 2025, but has subsequently attempted to revoke approval and wants the playhouse moved from its current location.

115. The Jacobs have informed the Association that G.J. has Angelman's syndrome and the necessity of the playhouse and landscaping for G.J. to have full use and enjoyment of the Property, in the same way as a non-disabled child.

116. The Association refuses to make reasonable accommodation for G.J.'s disability, in violation of the FFHA, to allow the playhouse to stay in its current location.

117. The area surrounding the playhouse was prepared and flattened in a manner that makes it safe for G.J. to utilize the yard to play.

118. This accommodation is necessary to enable G.J.'s full enjoyment of the Property.

119. Further, this accommodation provides him with a place to play and recreate, something many public parks cannot adequately accommodate due to his disability.

120. G.J. will be harmed if the playhouse is removed from its current location.

121. The Association's actions, individually and collectively, constitute a discriminatory housing practice under the FFHA. *See* 42 U.S.C. § 3613(f)(2) and (3).

122. The Association's discriminatory housing practice against G.J. violates the FFHA and entitles the Jacobs to temporary and permanent injunctive relief, as well as actual and punitive damages under the FFHA, in an amount to be determined at trial. *See* 42 U.S.C. § 3613(c)(1).

123. The amount of the Jacobs' actual damages is presently estimated to be more than $300,000.00.

124. The Jacobs are entitled to punitive damages upon the showing of a discriminatory housing practice, in an amount to be determined at trial. *See id.*

125.     The Jacobs are also entitled to their reasonable attorney fees and costs under the FFHA. *See* 42 U.S.C. § 3613(c)(2).

## SIXTH CLAIM FOR RELIEF
### (UFHA VIOLATION)

126.     The Jacobs incorporate all the preceding paragraphs by this reference as though fully set forth herein.

127.     Ryan F. and Anne Jacob, on behalf of G.J., seek relief under the UFHA.

128.     The Association is bound by the UFHA, in which disability is defined in part as "a physical or mental impairment that substantially limits one or more of a person's major life activities, including a person having a record of such an impairment or being regarded as having such an impairment." UTAH CODE § 57-21-2(10)(a).

129.     The UFHA requires the Association to grant reasonable accommodations to those with disabilities within the Association. *See* UTAH CODE § 57-21-5(4).

130.     G.J. has Angelman Syndrome, a genetic disorder that impacts his ability to walk, his speech, and creates an increased risk of seizures.

131.     G.J.'s disability impacted and delayed his ability to walk, and he is unable to play with neurotypical children.

132.     G.J. qualifies as having a disability that is protected by the UFHA.

133.     Consequently, the Jacobs sought to construct a family play area where G.J. could safely play, accommodating his disability.

134.     ARC approved the plans on August 29, 2025, but has subsequently revoked approval and wants the playhouse moved from its current location.

135. The Jacobs have informed the Association that G.J. has Angelman syndrome and the necessity of the playhouse and landscaping for G.J. to have full use and enjoyment of the Property, in the same way as a non-disabled child.

136. The Association refuses to make reasonable accommodation for G.J.'s disability, in violation of the UFHA, to allow the playhouse to stay in its current location.

137. The area surrounding the playhouse was prepared and flattened in a manner that makes it safe for G.J. to utilize the yard to play.

138. This accommodation is necessary to enable G.J.'s full enjoyment of the Property.

139. Further, this accommodation provides him with a place to play and recreate, something many public parks cannot adequately accommodate due to his disability.

140. G.J. will be harmed if the playhouse is removed from its current location.

141. The Association's actions, individually and collectively, constitute discrimination under the UFHA.

142. G.J. will be harmed if the playhouse is removed from its current location.

143. The Association's discrimination against G.J. violates the UFHA and entitles the Jacobs to temporary and permanent injunctive relief, as well as actual and punitive damages under the UFHA, in an amount to be determined at trial. *See* UTAH CODE § 57-21-12(7).

144. The amount of the Jacobs' actual damages is presently estimated to be more than $300,000.00.

145. In addition, the Association is subject to the UFHA's statutory civil penalties, including, but not limited to, a penalty of $10,000.00. *See* UTAH CODE §§ 57-21-12(7)(c) and 57-21-11(2).

146.    The Jacobs are also entitled to an award of attorney fees pursuant to UTAH CODE § 57-21-12(7)(b).

**PRAYER FOR RELIEF**

WHEREFORE, the Jacobs pray for relief in their favor and against the Association as follows:

1.    For a judgment, injunctive relief, and a judicial declaration against the Association as stated in the Jacobs' First Claim for Relief for Declaratory Judgment.

2.    For a monetary judgment against the Association on the Jacobs' Second Claim for Relief for Breach of Contract, in an amount to be determined at trial.

3.    For a monetary judgment against the Association on the Jacobs' Third Claim for Relief for Breach of the Implied Covenant, in an amount to be determined at trial.

4.    For injunctive relief and a monetary judgment against the Association on the Jacobs' Fourth Claim for Relief for Estoppel, in an amount to be determined at trial.

5.    For temporary and permanent injunctive relief, as well as a monetary judgment against the Association on the Jacobs' Fifth Claim for Relief for Violation of the FFHA, with the amount of the actual damages and punitive damages to be determined at trial.

6.    For temporary and permanent injunctive relief, as well as a monetary judgment against the Association on the Jacobs' Sixth Claim for Relief for Violation of the UFHA, with the amount of the actual damages and punitive damages to be determined at trial.

7.    For an award of attorney fees and costs incurred in this action pursuant to Section 7.1 of the Declaration, 42 U.S.C. § 3613(c)(2); and UTAH CODE § 57-21-12(7)(b).

8.    For other such relief as the Court deems just and appropriate.

## JURY DEMAND

Pursuant to Utah Rule of Civil Procedure 38, the Jacobs demand a trial by jury on all issues in this case determinable by a jury.

DATED this 10th day of April 2026.

ROSING DAVIDSON FROST

/s/ *Robert S. Rosing*
Robert S. Rosing
Jared C. Bowman
Cade W. Whitney
*Attorneys for Plaintiffs*

Plaintiffs' Address:
c/o Rosing Davidson Frost
136 Heber Ave., Suite 205
Park City, Utah 84060

## VERIFICATION

I hereby declare under criminal penalty of perjury under the laws of the State of Utah that the foregoing is true and correct to the best of my knowledge.

DATED this 10th day of April 2026.

/s/ *Ryan F. Jacob*
(*electronically signed with permission*)
Ryan F. Jacob
*Plaintiff*

## VERIFICATION

I hereby declare under criminal penalty of perjury under the laws of the State of Utah that the foregoing is true and correct to the best of my knowledge.

DATED this 10th day of April 2026.

/s/ *Anne Jacob*
(*electronically signed with permission*)
Anne Jacob
*Plaintiff*

23

# Exhibit A

DECLARATION OF PROTECTIVE COVENANTS
FOR AMERICAN FLAG SUBDIVISION

THIS DECLARATION is made this _13th_ day of _June_ , 1980, by ROYAL STREET LAND COMPANY, a Utah corporation.

I.      PURPOSE OF COVENANTS

1.1 It is the intention of Royal Street Land Company, expressed by its execution of this instrument, that the property within American Flag Subdivision be developed and maintained as a highly desirable residential area. It is the purpose of these covenants that the present natural beauty, view and surrounding of American Flag Subdivision shall always be protected insofar as is possible in connection with the uses and structures permitted by this instrument. Royal Street Land Company hereby declares that the Property and every part thereof is held and shall be held, conveyed, devised, leased, rented, encumbered, used, occupied and improved and otherwise affected in any manner subject to the provisions of this Declaration, each and all of which provisions are hereby declared to be in furtherance of the general plan and scheme of ownership referred to herein and are further declared to be for the benefit of the Property and every part thereof and for the benefit of each owner thereof. All provisions hereof shall be deemed to run with the land as covenants running with the land or as equitable servitudes as the case may be, and shall constitute benefits and burdens to the Declarant, its successors and assigns, and to all parties hereafter owning any interest in the Property.

II.     DEFINITIONS

2.1 Declarant: "Declarant" means Royal Street Land Company, together with its successor and assigns.

2.2  Property:  "Property" means that certain real property located in Summit County, Utah, described in Exhibit A attached hereto.

2.3  Building:  "Building" means any building constructed on the Property.

2.4  Lot:  A "Lot" shall mean any parcel of property shown as such on the recorded Subdivision plat.

2.5  Subdivision:  "Subdivision" shall mean American Flag Subdivision as recorded in the records of Summit County.

III.    AMERICAN FLAG HOMEOWNERS ASSOCIATION

3.1  General Purposes and Powers:  American Flag Homeowners Association ("Association") has been formed and incorporated as a Utah non-profit corporation to be constituted and to perform functions as provided in this Declaration and to further the common interests of all owners of property which may be subject, in whole or in part, to any or all of the provisions, covenants, conditions and restrictions contained in this Declaration.  The Association shall be obligated to and shall assume and perform all functions and obligations imposed on it or contemplated for it under this Declaration and any similar functions or obligations imposed on it or contemplated for it under any Supplemental or Amended Declaration.  The Association shall have all powers necessary or desirable to effectuate these purposes.  It shall not engage in commercial, profit making activity.

3.2  Membership in American Flag Subdivision Homeowners Association:  All persons who own any building lot in the Subdivision, by whatever means acquired, shall automatically become Members of the Association in accordance with the Articles of Incorporation and By-Laws of said Association as presently in effect and as the same may be duly amended from time to time.

-2-

IV.         ARCHITECTURAL COMMITTEE

4.1  Architectural Committee:  The Architectural Committee shall consist of three members.  The Committee shall consist of two members selected by the Declarant with the one remaining membership being selected by the American Flag Homeowners Association.  At such time as 90% of the lots are sold or in five years, whichever comes later, Declarant's memberships shall pass to the Homeowners Association.  Said Architectural Committee shall have and exercise all of the powers, duties and responsibilities set out in this instrument.

4.2  Approval by Architectural Committee:  No improvements of any kind, including but not limited to dwelling houses, swimming pools, ponds, parking areas, fences, walls, tennis courts, garages, drives, antennae, flag poles, curbs and walks shall ever be erected, altered, or permitted to remain on any lands within the Subdivision, nor shall any excavating, clearing, removal of trees, or shrubs, or landscaping be done on any lands within the Subdivision, unless the complete plans and specifications therefor are approved by the Architectural Committee prior to the commencement of such work.  A fee of $50 shall be paid to the Architectural Committee to cover costs and expenses of review.  Improvements, to be made after the initial improvements, which will cost less than $500 shall be submitted as directed to the Architectural Committee for approval but the fee of $50 shall not be required.  The Architectural Committee shall consider the materials to be used on the external features of said buildings or structures, including exterior colors, harmony of external design with existing structures within said subdivision, location with respect to topography and finished

-3-

grade elevations and harmony of landscaping with the natural setting and surroundings, and shall ascertain whether the architecture conforms to the architectural guidelines. The complete architectural plans and specifications must be submitted in duplicate and must include at least four different elevation views. One complete copy of the plans and specifications shall be signed for identification by the owner and left with the Architectural Committee. In the event the Architectural Committee fails to take any action within 45 days after complete plans for such work have been submitted to it, then all of such submitted plans shall be deemed to be approved.

4.3  Variances:  The Architectural Committee has the authority to deviate from the requirements contained herein in extenuating circumstances, when following these covenants would create an unreasonable hardship or burden for a property owner. An affirmative vote of a majority of the members of the Architectural Committee must be gained for a variance to be granted. The Architectural Committee does not however, have authority to allow deviation beyond the guidelines of the Park City Land Management Code.

4.4  General Requirements:  The Architectural Committee shall exercise its best judgment to see that all improvements, construction, landscaping, and alterations on the lands within the Subdivision conform and harmonize with the natural surroundings and with existing structures as to external design, materials, color, siting, height, topography, grade and finished grade elevation in keeping with the architectural guidelines.

4.5  Preliminary Approvals:  Persons who anticipate constructing improvements on lands within the Subdivision, whether

they already own lands or are contemplating the purchase of such lands may submit preliminary sketches of such improvements to the Architectural Committee for informal and preliminary approval or disapproval. All preliminary sketches shall be submitted in duplicate and shall contain a proposed site plan together with sufficient general information on all aspects that will be required to be in the complete plans and specification to allow the Architectural Committee to act intelligently on giving an informed preliminary approval or disapproval until such time as complete plans are submitted and approved or disapproved.

4.6 <u>Plans</u>: The Architectural Committee shall disapprove any plans submitted to it which are not sufficient for it to exercise the judgment required of it by these covenants.

4.7 <u>Architectural Committee Not Liable</u>: The Architectural Committee shall not be liable in damages to any person submitting any plans for approval, or to the Association or to any owner or owners of lands within the Subdivision, by reason of any action, failure to act, approval, disapproval, or failure to approve or disapprove, with regard to such plans. Any person or group acquiring the title to any Property in the Subdivision or any person submitting plans to the Architectural Committee for approval, by so doing shall be deemed to have agreed and covenanted that he, she, or they will not bring any action or suit to recover damages against the Architectural Committee, its members as individuals, or its advisors, employees, or agents.

4.8 <u>Written Records</u>: The Architectural Committee shall keep and safeguard complete written records of all applications for approval submitted to it (including one set of all preliminary sketches and all architectural plans so submitted) and of all actions of approval or disapproval and all other actions taken

by it under the provisions of this instrument which records shall be maintained for a minimum of five years after approval or disapproval.

V.        GENERAL RESTRICTIONS ON ALL PROPERTY

5.1  Zoning Regulations:  No lands within the Subdivision shall ever be occupied or used by or for any Building or purpose or in any manner which is contrary to the zoning regulations applicable thereto validly in force from time to time.

5.2  No Mining, Drilling or Quarrying:  No mining, quarrying, tunneling, excavating or drilling for any substances within the earth, including oil, gas, minerals, gravel, sand, rock, and earth, shall ever be permitted on the surface of the Property.

5.3  No Business Uses:  The Lots within the Property shall be used exclusively for residential living purposes, such purposes to be confined to approved residential Buildings within the Property.  No Lots within the Property shall ever be occupied or used for any commercial or business purposes provided, however, that nothing in this Paragraph 5.3 shall be deemed to prevent (a) Declarant or its duly authorized agent from using any Lot owned by Declarant as a sales model, or (b) any owner or his duly authorized agent from renting or leasing said owner's residential Building from time to time, subject to all of the provisions of this Declaration.

5.4  Restriction of Signs:  With the exception of a sign no larger than three square feet identifying the architect and a sign of similar dimension identifying the prime contractor to be displayed only during the course of construction and a sign no larger than three square feet for the owner to advertise his

-6-

home or lot for sale, no signs or advertising devices, including but without limitation, commercial, political, informational or directional signs or devices, shall be erected or maintained on any of the Property, except signs approved in writing by the Architectural Committee as to size, materials, color and location: (a) as necessary to identify ownership of the Lot and its address; (b) as necessary to give directions; (c) to advise of rules and regulations; (d) to caution or warn of danger; and (e) as may be required by law.

5.5   Restrictions on Animals:  No animals other than ordinary household pets may be kept or allowed to remain on any of the Property.  Such ordinary household pets may not be kept or allowed to remain on the Property unless and until written authorization is obtained from the Board of Trustees of the Association.  The Board of Trustees, in its sole discretion, shall have the right to revoke such authorization at any time in its sole discretion and shall have the power to require any owner or lessee of lands in the Subdivision to remove any animal or other pet belonging to it which is not disciplined or which constitues an undue annoyance to other owners or lessees of land in the Subdivision.

5.6   No Resubdivision:  No Lot shall be resubdivided and no Building shall be constructed or allowed to remain on any tract that comprises less than one full lot.

5.7   Underground Utility Lines:  All water, gas, electrical, telephone and all other utility lines within the limits of the Property must be buried underground and may not be exposed above the surface of the ground.

5.8   Service Yards:  All clothes lines, equipment, service yards or storage piles on any Lot in the Property shall be

-7-

kept screened by approved planting or fencing so as to conceal them from the view of neighboring Lots, access roads and area surrounding the Property.

5.9 Maintenance of Property: All Property and all improvements on any Lot shall be kept and maintained by the owner thereof in clean, safe, attractive and sightly condition and in good repair.

5.10 No Noxious or Offensive Activity: No noxious or offensive activity shall be carried on upon any Property nor shall anything be done or placed on any Property which is or may become a nuisance or cause embarrassment, disturbance or annoyance to others.

5.11 No Hazardous Activities: No activities shall be conducted on any Property and no improvements constructed on any Property which are or might be unsafe or hazardous to any person or property. Without limiting the generality of the foregoing, no firearms shall be discharged upon any Property and no open fires shall be lighted or permitted on any Property except in a contained barbecue unit while attended and in use for cooking purposes or within a safe and well-designed interior fireplace.

5.12 No Unsightliness: No unsightliness shall be permitted upon any of the Property. Without limiting the generality of the foregoing, (a) any unsightly structures, facilities, equipment, tools, boats, vehicles other than automobiles, objects and conditions shall be enclosed within an approved Building or appropriately screened from view, except equipment and tools when in actual use for maintenance or repairs; (b) No trailers, mobile homes, tractors, truck campers or trucks other than pickup trucks shall be kept or permitted to remain upon the Property; (c) no vehicle, boat or equipment shall be constructed, reconstructed,

-8-

repaired or abandoned upon any of the Property; (d) no lumber, grass, shrub or tree clippings, plant waste, metals, bulk materials or scrap shall be kept, stored or allowed to accummulate on any of the Property, except in service yards meeting the requirements of Section 5.8; (e) refuse, garbage and trash shall be placed and kept at all times in a covered container and such container shall be kept within an enclosed structure or appropriately screened from view; (f) hanging, drying or airing of clothing or household fabrics shall not be permitted within Buildings or on Lots if visible from Buildings, Lots or areas surrounding the Property.

5.13 <u>No Annoying Lights, Sounds or Odors</u>:  No light shall be emitted from any Lot or Property which is unreasonably bright or causes unreasonable glare; no sound shall be emitted from any Lot or Property which is unreasonably loud or annoying including but without limitation, speakers, horns, whistles, bells or other sound devices, except security and fire alarm devices used exclusively to protect any of the Property or Buildings; and no odors shall be emitted from any Lot or Property which is noxious or offensive to others.

5.14 <u>No Cesspools or Septic Tanks</u>:  No cesspools or septic tanks shall be permitted on any Property.  Any other type of sewage disposal system shall be installed only after approval by the Architectural Committee and all governmental health authorities having jurisdiction.

5.15 <u>Rules and Regulations</u>:  No owner shall violate the rules and regulations for the use of the Lots as adopted from time to time by the Association.  No such rules or regulations shall be established which violate the intention or provisions of this Declaration or which shall unreasonably restrict the use of any Lot by the owner thereof.

-9-

VI.    RESTRICTION ON LOTS

6.1  Number and Location of Buildings:  No Building or structures shall be placed, erected, altered, or permitted to remain on any Lot other than one single family dwelling and one garage together with related nonresidential structures and improvements of the types described in Section 4.2 hereof.  At the time of construction of the single family dwelling on any Lot, said Lot must also be improved with a garage with at least a two-car capacity.

6.2  Residence Floor Area:  The single-family dwelling which may be constructed on a Lot in the Property shall have a minimum living floor area, exclusive of garages, balconies, porches, and patios of 2,000 square feet.

6.3  Single Family Dwelling to be Constructed First:  No garage or other structure shall be constructed on any Lot until after commencement of construction of the single family dwelling on the same Lot except as otherwise specifically permitted by the Architectural Committee.  All construction and alteration work shall be prosecuted diligently, and each Building, structure, or improvement which is commenced on any Lot shall be entirely completed within 18 months after commencement of construction.

6.4  Setbacks and Building Placement:  All Buildings on all Lots shall be set back at least 12 feet from the side, 20 feet from the rear, and 25 feet from the front lot line.  The "Front Lot Line" is defined to mean that Lot line of a Lot abutting on a dedicated road.  On corner lots, the side yard which faces a street is to be setback a minimum of 12 feet with consideration given to the maintenance of a clear view of intersecting streets as defined in the Park City Land Management Code.

-10-

6.5  Height Limitations:  No portion of a building on the Property shall be erected to a height greater than 28 feet, measured from natural or unmodified grade at that point on the building site.  This measurement applies to all elevations of the building, the intent being that buildings will conform with and reflect the natural contour of the land.

6.6  Towers and Antennae:  No Towers, and no exposed or outside radio, television or other electronic antennae, with the exception of television receiving antennae shall be allowed or permitted to remain on any lot.  It is recommended that lightning rods be installed on all structures.

6.7  Used or Temporary Structures:  No used or previously erected or temporary house, structure, house trailer, mobile home, camper, or nonpermanent outbuilding shall ever be placed, erected, or allowed to remain on any Lot except during construction periods, and no dwelling house shall be occupied in any manner prior to its completion and approval in accordance with Section 4.9 hereof.

6.8  Fences:  It is the general intention that all perimeter fencing within the Property have a continuity of appearance in keeping with the setting and surroundings of the Property.  The term "perimeter fencing" is defined to mean fences along or near Lot lines or fencing not connected with a Building or structure.  All perimeter fencing shall be of a type specified by the Architectural Committee.  Interior fences, screens or walls which are associated or connected with a Building or structure may be of such design, material and height as may be approved by the Architectural Committee.

6.9  Flashings and Roof Gutters:  Flashing or roof gutters or other metal fittings on the exterior of Buildings shall be painted to match adjacent materials on Buildings.

-11-

6.10 <u>Building Location and Driveway Length</u>:  In no event shall the length of the driveway on Lots No. 1 through No. 9, inclusive, No. 15, No. 16, No. 33 through No. 51, inclusive, or No. 59 through No. 68, inclusive, measured from the point at which said driveway connects with the street to a point at which said driveway first touches a building situated on said Lot exceed one-third of the longest straight boundary line of the particular lot.

6.11 <u>Driveway Access</u>:  Driveway access for all Lots within the subdivision may not be from any street or road other than interior roads within the Subdivision.

6.12 <u>Building Masses, Form and Roof Lines</u>:  In all cases, building masses, forms and roof lines shall conform to and with existing contours.  On Lots No. 1 through No. 9, inclusive, No. 33 through No. 51, Inclusive, and No. 59 through No. 68, inclusive, buildings must be designed and constructed in such a manner that the street side access portion of the Building shall not exceed one livable story in height and then terrace down the slope for the balance of the structure.  At no point shall the maximum height of any structure on any of the lots designated in this Section 6.12 exceed in elevation two stories of living space above the existing land contour at said point.

6.13 <u>Sewer Ejector Pumping Systems</u>:  The owners of Lots No. 33 through No. 51, inclusive or Lot 53, and any party utilizing said lots shall be obligated to construct, maintain and operate on each of said lots a sewer ejector pumping system sufficient to transmit all sewage eminating from any building or structure on said lot to the transmission lines of the Snyderville Basin Sewer Improvement District, or such other entity as furnishes sewer disposal services in connection with said Lot, and meeting all requirements of the Snyderville Basin Sewer Improvement District or such other entity.

-12-

VII.    ENFORCEMENT

7.1  Enforcement and Remedies: The obligations, provisions, covenants, restrictions and conditions contained in this Declaration or any Supplemental or Amended Declaration with respect to the Association or Lots shall be enforceable by Declarant or by any owner of a Lot subject to this Declaration by a proceeding for a prohibitive or mandatory injunction.  The obligations, provisions, covenants, restrictions and conditions contained in this Declaration or any supplemental or Amended Declaration with respect to a person or entity or property of a person or entity other than the Association or Declarant shall be enforceable by Declarant or the Association by a proceeding for a prohibitive or mandatory injunction.  If court proceedings are instituted in connection with the rights of enforcement and remedies provided in this Declaration, the prevailing party shall be entitled to recover its costs and expenses in connection therewith, including reasonable attorney's fees.

7.2  Protection of Encumbrances:  No violation or breach of any provision, restriction, covenant or condition contained in this Declaration or any Supplemental or Amended Declaration and no action to enforce the same shall defeat, render invalid or impair the lien of any mortgage or deed of trust taken in good faith and for value and perfected by recording prior to the time of recording of an instrument giving notice of such violation or breach, or the title or interest of the holder thereof or the title acquired by any purchaser upon foreclosure of any such mortgage or deed of trust.  Any such purchaser shall, however, take subject to this Declaration or any Supplemental or Amended Declaration except only that violations or breaches which occur prior to such foreclosure shall not be deemed breaches or violations hereof with respect to such purchaser, his heirs, personal representatives, successors and assigns.

BOOK ᴀ160 PAGE 227

7.3  Limited Liability:  Neither Declarant, the Association, the Board of Trustees of the Association, the Architectural Committee nor any member, agent or employee of any of the same shall be liable to any party for any action or for failure to act with respect to any matter if the action taken or failure to act was in good faith and without malice.

VIII.    GENERAL PROVISIONS

8.1  Duration of Declaration:  Any provision, covenant, condition or restriction contained in this Declaration or any Supplemental or Amended Declaration which is subject to the common law rule sometimes referred to as the rule against perpetuities, shall continue and remain in full force and effect for the period of fifty years or until this Declaration is terminated as hereinafter provided, whichever first occurs.  All other provisions, covenants, conditions and restrictions contained in this Declaration or in any Supplemental or Amended Declaration shall continue and remain in full force and effect until January 1, 2030, A.D., provided however, that unless at least one year prior to said time of expiration, there is recorded an instrument directing the termination of this Declaration, executed by the owners of not less than 90% of the Lots then subject to this Declaration, said other provisions, covenants, conditions and restrictions shall continue automatically for an additional ten years and thereafter for successive periods of ten years unless, at least one year prior to the expiration of any such extended period of duration, this Declaration is terminated by recorded instrument directing termination signed by the owners of not less than 90% of the Lots then subject to this Declaration as aforesaid.

8.2  Amendment or Revocation:  At any time while any provision, covenant, condition or restriction contained in this

-14-

BOOK 160 PAGE 22

Declaration or any Supplemental or Amended Declaration is in force and effect, it may be amended or repealed by the recording of a written instrument specifying the amendment or the repeal, executed by the owners of not less than 90% of the Lots then subject to this Declaration.  No such amendment or repeal shall be effective with respect to the holder or successor or assign of the holder of a mortgage or deed of trust recorded prior to recording of the instrument specifying the amendment or repeal unless such holder executes the said instrument.

8.3  Severability:  Invalidity or unenforceability of any provision of this Declaration or of any Supplemental or Amended Declaration in whole or in part shall not affect the validity or enforceability of any other provision or valid and enforceable part of a provision of this Declaration.

8.4  Captions:  The captions and headings in this instrument are for convenience only and shall not be considered in construing any provision, restriction, covenant or condition contained in this Declaration.

8.5  No Waiver:  Failure to enforce any provision, restriction, covenant or condition in this Declaration or in any Supplemental or Amended Declaration shall not operate as a waiver of any such provision, restriction, covenant or condition or of any other provision, restriction, covenant or condition.

IN WITNESS WHEREOF, Royal Street Land Company has executed this Declaration the day and year first above written.

ROYAL STREET LAND COMPANY
a Utah corporation

Merle H. Huseth, President

-15-

BOOK 160 PAGE 227

STATE OF UTAH    )
                 : ss.
COUNTY OF SUMMIT  )

On the *13th* day of *June*, 1980, personally appeared before me Merle H. Huseth, who, being by me duly sworn, did say that he is the President of Royal Street Land Company, a Utah corporation, and that the within and foregoing Declaration of Protective Covenants for American Flag Subdivision was signed in behalf of said corporation by authority of the unanimous written consent of all the Directors of its Board of Directors, and said Merle H. Huseth duly acknowledged to me that said corporation executed the same and that the seal affixed is the seal of said corporation.

NOTARY PUBLIC
Residing at Park City, Utah

My Commission Expires:

3-16-83

-16-

BOOK 160 PAGE 230

EXHIBIT A

Parcel 1

Beginning at a point N. 0°30'11" E. 715.055 along a section line and East 547.82 from the Southeast corner of Section 16, T. 2 S., R. 4 E., S.L.B.&M. and running thence East 788.50 feet; thence South 111.81 feet; thence S. 71°02' W. 44.78 feet to a point of a 315.00 foot radius curve to the left, the radius point of which bears S. 18°58' E. 315.00 feet; thence South-westerly along the arc of said curve 107.35 feet to a point of tangency; thence S. 51°30'23" W. 62.64 feet to a point of a 305.00 foot radius curve to the left, the radius point of which bears S. 38°29'37" E. 305.00 feet; thence Southwesterly along the arc of said curve 299.17 feet to a point of a 954.65 foot radius compound curve to the left, the radius point of which bears S. 81°32'39" E. 954.65 feet; thence Southerly along the arc of said curve 192.253 feet to a point of tangency; thence S. 3°04'54" E. 157.695 feet to a point of a 1115.00 foot radius curve to the left, the radius point of which bears N. 86°55'06" E. 1115.00 feet; thence Southeasterly along the arc of said curve 197.95 feet to a point of a 2101.81 foot radius compound curve to the left, the radius point of which bears N. 76°44'47" E. 2101.81 feet; thence Southeasterly along the arc of said curve 211.77 feet to a point of tangency; thence S. 19°01'35" E. 396.06 feet; thence West 701.53 feet; thence N. 33°15' E. 100.00 feet; thence N. 50°31'45" W. 56.73 feet; thence N. 8°22'17" E. 555.91 feet; thence S. 47°39' W. 298.67 feet; thence N. 50°38' W. 443.10 feet; thence N. 26°39' W. 167.60 feet; thence N. 47°39' E. 733.10 feet; thence N. 0°21'43" W. 140.00 feet to the point of beginning. Contains 26.058 acres.

Parcel 2

Beginning at a point South 1653.09 feet and East 1576.86 feet from the Southeast corner of Section 16, T. 2 S., R. 4 E., S.L.B.&M. and running thence S. 45°00' E. 228.55 feet; thence N. 81°00' E. 512.70 feet; thence N. 16°40' E. 1268.00 feet; thence North 365.95 feet to a point of a 779.20 foot radius curve to the left, the radius point of which bears S. 51°08'14" W. 779.20 feet; thence Northwesterly along the arc of said curve 40.29 feet to a point of tangency; thence N. 41°49'32" W. 402.97 feet to a point of a 503.76 foot radius curve to the left, the radius point of which bears S. 48°10'28" W. 503.76 feet; thence Northwesterly along the arc of said curve 124.655 feet to a point of tangency; thence N. 56°00'12" W. 321.16 feet to a point of a 365.00 foot radius curve to the left, the radius point of which bears S. 33°59'48" W. 365.00 feet; thence Northwesterly along the arc of said curve 146.91 feet to a point of tangency; thence N. 79°03'51" W. 338.12 feet to a point of a 145.00 foot radius curve to the left, the radius point of which bears S. 10°56'09" W. 145.00 feet; thence Westerly along the arc of said curve 75.68 feet to a point of tangency; thence S. 71°02' W. 94.40 feet to a point of a 245.00 foot radius curve to the left, the radius point of which bears S. 18°58' E. 245.00 feet; thence Southwesterly along the arc of said curve 83.50 feet to a point of tangency; thence S.

BOOK 160 PAGE 231

51°30'02" W. 62.64 feet to a point of a 235.00 foot radius curve to the left, the radius point of which bears S. 38°29'37" E. 235.00 feet; thence Southwesterly along the arc of said curve 176.57 feet to a point of a 884.64 foot radius curve to the left, the radius point of which bears S. 81°32'39" E. 884.64 feet; thence Southerly along the arc of said curve 178.14 feet to a point of tangency; thence S. 3°04'54" E. 157.70 feet to a point of a 1045.00 foot radius curve to the left, the radius point of which bears N. 86°55'06" E. 1045.00 feet; thence Southeasterly along the arc of said curve 185.52 feet to a point of a 2031.80 foot radius curve to the left, the radius point of which bears N. 76°44'47" E. 2031.80 feet; thence Southeasterly along the arc of said curve 204.71 feet to a point of tangency; thence S. 19°01'35" E. 573.35 feet to a point of a 866.65 foot radius curve to the left, the radius point of which bears N. 70°58'25" E. 866.65 feet; thence Southeasterly along the arc of said curve 229.13 feet to a point of tangency; thence S. 34°10'28" E. 211.53 feet to a point of a 245.00 foot radius curve to the right, the radius point   which bears S. 55°49'32" W. 245.00 feet; thence Southerly along the arc of said curve 338.55 feet to the point of beginning. Contains 57.032 acres.

BOOK 3160 PAGE 232

Royal Street Land Company
Box 889
Park City, UT 84060

Entry No. 167524 Book M160
RECORDED 6-16-80 at 2:25 M Page 373
REQUEST of Royal Street Ltd.
FEE          WANDA Y. SPRIGGS, SUMMIT CO. REC
$ 7.50           By
INDEXED          ABSTRACT

## AMENDMENT TO DECLARATION OF
## PROTECTIVE COVENANTS
### FOR
## AMERICAN FLAG SUBDIVISION

THIS Amendment to Declaration of Protective Covenants for American Flag Subdivision, made this 16th day of June, 1980, by Royal Street Land Company, a Utah corporation (hereinafter designated "Declarant");

### W I T N E S S E T H:

WHEREAS, Declarant executed a certain Declaration of Protective Covenants for American Flag Subdivision, dated June 12, 1980 (hereinafter designated the "Declaration"); and

WHEREAS, the Declaration was recorded in the office of the County Recorder of Summit County, State of Utah, on June 12, 1980, as Entry No. 167467 in Book M160, Pages 215 to 232 of the records of said office; and

WHEREAS, it has been determined that certain errors exist in Exhibit A attached to said Declaration. and it is the desire of the Declarant to correct said errors.

NOW, THEREFORE, the Declarant hereby declares and agrees as follows:

1. The Declaration is hereby amended so as to delete Exhibit A attached thereto, as it presently appears, and to substitute therefor the form of Amended Exhibit A attached hereto and by this reference made a part hereof. Said Amended Exhibit A shall hereafter be deemed to be Exhibit A to the Declaration for all purposes of the Declaration.

2. Any real property described in Exhibit A to the Declaration which is not described in Amended Exhibit A attached

BOOK M160 PAGE 340

hereto shall hereafter not be bound in any manner by the Declaration nor subject to any of the terms thereof.

3.   This Amendment to Declaration of Protective Covenants for American Flag Subdivision shall not be deemed to amend or modify the Declaration except as herein specifically provided.

DATED the day and year first above written.

ROYAL STREET LAND COMPANY

By _____
                    President

STATE OF UTAH        )
                     : ss.
COUNTY OF SUMMIT     )

On this _16th_ day of June, 1980, personally appeared before me Merle H. Huseth, who, being by me duly sworn, did say that he is the President of Royal Street Land Company, a Utah corporation, and that the within and foregoing Amendment to Declaration of Protective Covenants for American Flag Subdivision was signed on behalf of said corporation by authority of a resolution of its Board of Directors, and said Merle H. Huseth duly acknowledged to me that said corporation executed the same and that the seal affixed is the seal of said corporation.

_____
NOTARY PUBLIC
Residing at: _Park City, Utah_

My Commission Expires:
_3-16-83_

-2-

BOOK M160 PAGE 34

AMENDED
EXHIBIT A

### Parcel 1

Beginning at a point N. 0°30'11" E. 715.055 along a section line and East 547.82 from the Southeast corner of Section 16, T. 2 S., R. 4 E., S.L.B.& M. and running thence East 783.50 feet; thence South 111.81 feet; thence S. 71°02' W. 44.78 feet to a point of a 315.00 foot radius curve to the left, the radius point of which bears S. 18°58' E. 315.00 feet; thence Southwesterly along the arc of said curve 107.35 feet to a point of tangency; thence S. 51°30'23" W. 62.64 feet to a point of a 305.00 foot radius curve to the left, the radius point of which bears S. 38°29'37" E. 305.00 feet; thence Southwesterly along the arc of said curve 229.17 feet to a point of a 954.65 foot radius compound curve to the left, the radius point of which bears S. 81°32'39" E. 954.65 feet; thence Southerly along the arc of said curve 192.235 feet to a point of tangency; thence S. 3°04'54" E. 157.695 feet to a point of a 1115.00 foot radius curve to the left, the radius point of which bears N. 86°55'06" E. 1115.00 feet; thence Southeasterly along the arc of said curve 197.95 feet to a point of a 2101.81 foot radius compound curve to the left, the radius point of which bears N. 76°44'47" E. 2101.81 feet; thence Southeasterly along the arc of said curve 211.77 feet to a point of tangency; thence S. 19°01'35" E. 396.06 feet; thence West 701.53 feet; thence N. 33°15' E. 100.00 feet; thence N. 50°31'45" W. 56.73 feet; thence N. 8°22'17" E. 555.91 feet thence S. 47°39' W. 298.67 feet; thence N. 50°38' W. 443.10 feet; thence N. 26°39' W. 167.60 feet; thence N. 47°39' E. 733.10 feet; thence N. 0°21'43" W. 140.00 feet to the point of beginning. Contains 26.058 acres.

### Parcel 2

Beginning at a point South 1674.96 feet and East 1598.73 feet from the Southeast corner of Section 16, T. 2 S., R. 4 E., S.L.B.& M. and running thence S. 45°00' E. 197.62 feet; thence N. 81°00' E. 512.70 feet; thence N. 16°40' E. 1268.00 feet; thence North 365.95 feet to a point of a 779.20 foot radius curve to the left, the radius point of which bears S. 51°08'14" W. 779.20 feet; thence Northwesterly along the arc of said curve 40.29 feet to a point of tangency; thence N. 41°49'32" W. 402.97 feet to a point of a 503.76 foot radius curve to the left, the radius point of which bears S. 48°10'28" W. 503.76 feet; thence Northwesterly along the arc of said curve 124.635 feet to a point of tangency; thence N. 56°00'12" W. 321.16 feet to a point of a 365.00 foot radius curve to the left, the radius point of which bears S. 33°59'48" W. 365.00 feet; thence Northwesterly along the arc of said curve 146.91 feet to a point of tangency; thence N. 79°03'51" W. 338.12 feet to a point of a 145.00 foot radius curve to the left, the radius point of which bears S. 10°56'09" W. 145.00 feet; thence Westerly along the arc of said curve 75.68 feet to a point of tangency; thence S. 71°02' W. 94.40 feet to a point of a 245.00 foot radius curve to the left, the radius point of which bears S. 18°58' E. 245.00 feet; thence Southwesterly along the arc of said curve 83.50 feet to a point of tangency; thence S.

BOOK ★160 PAGE 76

51°30'02" W. 62.64 feet to a point of a 235.00 foot radius curve to the left, the radius point of which bears S. 38°29'37" E. 235.00 feet; thence Southwesterly along the arc of said curve 176.57 feet to a point of a 884.64 foot radius curve to the left, the radius point of which bears S. 81°32'39" E. 884.64 feet; thence Southerly along the arc of said curve 178.14 feet to a point of tangency; thence S. 3°04'54" E. 157.70 feet to a point of a 1045.00 foot radius curve to the left, the radius point of which bears N. 86°55'06" E. 1045.00 feet; thence Southeasterly along the arc of said curve 185.52 feet to a point of a 2031.80 foot radius curve to the left, the radius point of which bears N. 76°44'47" E. 2031.80 feet; thence Southeasterly along the arc of said curve 204.71 feet to a point of tangency; thence S. 19°01'35" E. 573.35 feet to a point of a 866.65 foot radius curve to the left, the radius point of which bears N. 70°58'25" E. 866.65 feet; thence Southeasterly along the arc of said curve 229.13 feet to a point of tangency; thence S. 34°10'28" E. 211.53 feet to a point of a 245.00 foot radius curve to the right, the radius point of which bears S. 55°49'32" W. 245.00 feet; thence Southerly along the arc of said curve 188.70 feet to a point of tangency; thence S. 9°57'18" W. 70.95 feet to a point of a 210.00 foot radius curve to the right, the radius point of which bears N. 80° 02' 42" W. 210.00 feet; thence Southerly along the arc of said curve 90.25 feet to the point of beginning.
Contains 56.986 acres.

-2-

BOOK #160 PAGE 363

WHEN RECORDED, MAIL TO:
Lincoln Hobbs Esq.
620 J ST
Salt Lake City, Utah 84103

**01193596    B: 2752 P: 1759**
Page 1 of 4
Rhonda Francis Summit County Recorder
08/12/2022 10:20:14 AM Fee $204.00
By COALITION TITLE AGENCY, INC.
Electronically Recorded

## SECOND AMENDMENT TO
## DECLARATION OF
## PROTECTIVE COVENANTS
## FOR
## AMERICAN FLAG SUBDIVISION

THIS SECOND AMENDMENT TO DECLARATION (the "Second Amendment") is made and executed by AMERICAN FLAG HOMEOWNERS ASSOCIATION, a Utah non-profit corporation (the "Association"), pursuant to the provisions of the Utah Community Association Act, Utah Code Annotated §§57-8a-101 through 57-8a-703 (the "Act"), for itself, its successors, grantees and assigns.

## RECITALS

The Declaration of Protective Covenants for American Flag Subdivision was recorded on June 12,1980, as Entry No. 167467 in Book 160, Page 215, Official Records of the Recorder of Summit County, Utah, as amended by Amendment to Declaration of Protective Covenants for American Flag Subdivision recorded on June 16, 1980, as Entry No. 167524 in Book 160, Page 340, aforesaid records (hereinafter collectively referred to as the "Declaration"). Reference is hereby made to the Declaration for all defined terms not otherwise defined herein.

Having obtained the affirmative written consent of 67% of the Owners of Lots in the Subdivision as required by §57-8a-104 of the Act, the Association hereby makes the following amendments to the Declaration:

1. Section 4.2 of the Declaration is hereby amended by deleting the second and third sentences in said section in their entirety and by inserting the following sentence in their place:

   "A reasonable fee, as determined by the Board in accordance with §57-8a-109 of the Act, shall be paid to the Association to cover costs and expenses of plan review and approval."

**THIS IS AN ACCOMMODATION RECORDING ONLY**

2. Section 6.6 of the Declaration is hereby deleted in its entirety and the following new Section 6.6 is inserted in its place:

"6.6 <u>Outdoor Electronic Equipment</u>.  Plans for the installation on a Lot or its Improvements of outdoor electronic devices such as radio antennae, television and internet receiving dishes, and solar panels shall be submitted to the Architectural Committee for approval as set forth in Section 4.2 of the Declaration. All such approved equipment shall be located and affixed to the principal residence building located on the Lot."

3. Article VI of the Declaration is hereby amended by adding the following new Section 6.14:

"6.14 <u>Nature of and Restrictions on Ownership and Use</u>. Each Owner shall have and enjoy the rights and privileges of fee simple ownership of their Lot and the Improvements thereon. There shall be no requirements concerning who may own Lots or Improvements, it being intended that they may be and shall be owned as any other property rights by persons, corporations, partnerships or trusts or in the form of common or joint tenancy so long as the beneficial ownership interest in any Lot or its Improvements is not owned by more than six (6) persons or entities. The Owners may lease or rent their Lots and the Improvements thereon with their appurtenant rights subject to the terms and conditions chosen solely by the Owner and their lessee or tenant, except that all Owners, their tenants and other occupants or users of the Subdivision, shall be subject to the Act, this Declaration, the Bylaws, and all Rules and Regulations of the Association."

4. <u>No Other Changes</u>. Except as set forth Paragraphs 1 through 3 above, the Declaration shall otherwise remain unchanged and in full force and effect.

[Signature Page Follows]

01193596  Page 2 of 4  Summit County

-2-

IN WITNESS WHEREOF, the undersigned has caused this Second Amendment to be executed on its behalf this ___ day of ___Aug.___, 2022.

AMERICAN FLAG HOMEOWNERS ASSOCIATION,
a Utah non-profit corporation

By:
Richard Barros
Its President

STATE OF UTAH        }
                     } ss.
COUNTY OF SUMMIT     }

On the ___ day of ___Aug.___, 2022, personally appeared before me Richard Barros, signer of the above Second Amendment, who being duly sworn, did say that he is the President of American Flag Homeowners Association, a non-profit corporation of the State of Utah, and that the foregoing amendment was approved by a vote of more than 67 percent (67%) of the voting interests in the Association, and the foregoing Second Amendment was signed in behalf of said corporation under authority granted by its articles of incorporation and its bylaws, and said Richard Barros duly acknowledged to me that said corporation executed the same.

**CRAIG R RODMAN**
Notary Public, State of Utah
My Commission Expires on:
August 12, 2026
Comm. Number: 725551

Notary Public
Residing at: Park City, UT

My Commission Expires:
8/12/2026

01193596  Page 3 of 4  Summit County

-3-

Unofficial Copy

## EXHIBIT "A"

## LEGAL DESCRIPTION

ALL OF LOTS 1-87 INCLUSIVE AND LOTS 90-93 INCLUSIVE, AMERICAN FLAG SUBDIVISION; ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED APRIL 16, 1980 AS ENTRY NO. 165808 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial Nos. AF-1, AF-2, AF-3, AF-4, AF-5, AF-6, AF-7, AF-8, AF-9, AF-10, AF-11, AF-12, AF-13, AF-14, AF-15, AF-16, AF-17, AF-18, AF-19, AF-20, AF-21, AF-22, AF-23, AF-24, AF-25, AF-26, AF-27, AF-28, AF-29, AF-30, AF-31, AF-32, AF-33, AF-34, AF-35, AF-36, AF-37, AF-38, AF-39, AF-40, AF-41, AF-42, AF-43, AF-44, AF-45, AF-46, AF-47, AF-48, AF-49, AF-50, AF-51, AF-52, AF-53, AF-54, AF-55, AF-56, AF-57, AF-58, AF-59, AF-60, AF-61, AF-62, AF-63, AF-64, AF-65, AF-66, AF-67, AF-68, AF-69, AF-70, AF-71, AF-72, AF-73, AF-74, AF-75, AF-76, AF-77, AF-78, AF-79, AF-80, AF-81, AF-82, AF-83, AF-84, AF-85, AF-86, AF-87, AF-90, AF-91, AF-92, AF-93)


ALL OF LOT 88, LOTS 88 AND 89 AMERICAN FLAG SUBDIVISION PLAT AMENDMENT NO. 2; ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MAY 21, 2003 AS ENTRY NO. 659191 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial No. AF-88-2-AM)

**01208455   B: 2791 P: 0464**
Page 1 of 3
Rhonda Francis Summit County Recorder
08/21/2023 11:33:20 AM Fee $200.00
 By COALITION TITLE AGENCY, INC.
Electronically Recorded

WHEN RECORDED, MAIL TO:
Lincoln Hobbs Esq.
620 J ST
Salt Lake City, Utah 84103

## THIRD AMENDMENT TO
## DECLARATION OF
## PROTECTIVE COVENANTS
## FOR
## AMERICAN FLAG SUBDIVISION

THIS THIRD AMENDMENT TO DECLARATION (the "Third Amendment") is made and executed by AMERICAN FLAG HOMEOWNERS ASSOCIATION, a Utah non-profit corporation (the "Association"), pursuant to the provisions of the Utah Community Association Act, Utah Code Annotated §§57-8a-101 through 57-8a-703 (the "Act"), for itself, its successors, grantees and assigns.

### RECITALS

The Declaration of Protective Covenants for American Flag Subdivision was recorded on June 12,1980, as Entry No. 167467 in Book 160, Page 215, Official Records of the Recorder of Summit County, Utah, as amended by Amendment to Declaration of Protective Covenants for American Flag Subdivision recorded on June 16, 1980, as Entry No. 167524 in Book 160, Page 340,and thereafter amended by the Second Amendment to Declaration of Protective Covenants for American Flag Subdivision recorded on August 12, 2022 as Entry No. 01193596 in Book 2752, Page 1759 (aforesaid records hereinafter collectively referred to as the "Declaration"). Reference is hereby made to the Declaration for all defined terms not otherwise defined herein.

Having obtained the affirmative written consent of 67% of the Owners of Lots in the Subdivision as required by §57-8a-104 of the Act, the Association hereby makes the following amendments to the Declaration:

1. Article V of the Declaration is hereby amended by adding the following new Section 5.16 as follows:

THIS IS AN ACCOMMODATION
RECORDING ONLY

"5.16 Rental Agreements. All leases and rentals of an Owner's Lot and its Improvements shall be for a minimum of one week, defined as seven consecutive nights.

2. <u>No Other Changes</u>. Except as set forth Paragraph 1 above, the Declaration shall otherwise remain unchanged and in full force and effect.

IN WITNESS WHEREOF, the undersigned has caused this Second Amendment to be executed on its behalf this _18_ day of August, 2023.

> AMERICAN FLAG HOMEOWNERS ASSOCIATION,
> a Utah non-profit corporation
>
> By:_____.
> Robert Boone
> Its President

STATE OF UTAH            }
                         } ss.
COUNTY OF SUMMIT         }

On the _18_ day of August, 2023, personally appeared before me Robert Boone, signer of the above Second Amendment, who being duly sworn, did say that he is the President of American Flag Homeowners Association, a non-profit corporation of the State of Utah, and that the foregoing amendment was approved by a vote of more than 67 percent (67%) of the voting interests in the Association, and the foregoing Second Amendment was signed in behalf of said corporation under authority granted by its articles of incorporation and its bylaws, and said Robert Boone duly acknowledged to me that said corporation executed the same.

> _____
> Notary Public
> Residing at: Kamas UT. 84036

My Commission Expires:

_January 14, 2025_

Notary Public - State of Utah
Larissa Louesa Pearce
Comm. #716141
My Commission Expires
January 14, 2025

-2-

01208455  Page 2 of 3  Summit County

# EXHIBIT "A"

## LEGAL DESCRIPTION

ALL OF LOTS 1-32, 35-68, 71-87, AND LOTS 90-93 INCLUSIVE, AMERICAN FLAG SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED APRIL 16, 1980 AS ENTRY NO. 165808 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial Nos. AF-1, AF-2, AF-3, AF-4, AF-5, AF-6, AF-7, AF-8, AF-9, AF-10, AF-11, AF-12, AF-13, AF-14, AF-15, AF-16, AF-17, AF-18, AF-19, AF-20, AF-21, AF-22, AF-23, AF-24, AF-25, AF-26, AF-27, AF- 28, AF-29, AF-30, AF-31, AF-32, AF-35, AF-36, AF-37, AF-38, AF-39, AF-40, AF-41, AF-42, AF-43, AF-44, AF-45, AF-46, AF-47, AF-48, AF-49, AF-50, AF-51, AF-52, AF-53, AF-54, AF-55, AF-56, AF-57, AF-58, AF-59, AF-60, AF-61, AF-62, AF-63, AF-64, AF-65, AF-66, AF-67, AF-68, AF-71, AF-72, AF-73, AF-74, AF-75, AF-76, AF-77, AF-78, AF-79, AF-80, AF-81, AF-82, AF-83, AF-84, AF-85, AF-86, AF-87, AF-90, AF-91, AF-92, AF-93)


ALL OF LOT 88, LOTS 88 AND 89 AMERICAN FLAG SUBDIVISION PLAT AMENDMENT NO. 2; ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MAY 21, 2003 AS ENTRY NO. 659191 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial No. AF-88-2-AM)


ALL OF LOT 1, KING REPLAT, LOT LINE ADJUSTMENT, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED OCTOBER 13, 1998 AS ENTRY NO. 519720 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial No. KING-1)


ALL OF 395 CENTENNIAL CIRCLE SUBDIVISION, A PARCEL COMBINATION PLAT, A COMBINATION OF LOTS 69 & 70, AMERICAN FLAG SUBDIVISION, ACCORDING TO THE OFFICIAL PLAT THEREOF, RECORDED MAY 15, 2009 AS ENTRY NO. 872525 OF THE OFFICIAL RECORDS IN THE OFFICE OF THE SUMMIT COUNTY RECORDER.

(Tax Serial No. 395-CCS-ALL)

# Exhibit B

AMERICAN FLAG SUBDIVISION
RULES AND REGULATIONS

On November 9, 2022, the following rules and regulations were adopted by the Board of Directors of the American Flag Homeowners Association (the "Association") pursuant to the authority granted under the Declaration of Protective Covenants for American Flag Subdivision, the Association's Articles of Incorporation and Bylaws, the Association's Rules and Regulations, and The Utah Community Association Act (the "Governing Documents"). All owners of lots and residences in the subdivision, their family members, tenants and invitees are required to comply with the requirements set forth herein, and failure to do so may subject any such persons to fines and liability for damages and expenses as set forth below or in the Governing Documents.

- <u>Garbage and Recycling Disposal</u>. All household garbage and recycling items shall be placed and kept at all times in covered containers and such containers shall be kept within enclosed structures or appropriately screened from view. Such containers may only be placed curbside in front of the owner's lot beginning the day before the scheduled pick-up date by the contractor licensed by Park City Municipal Corporation and must be removed from curbside no later than the day following such scheduled pick-up date or the actual pick-up date in case of a delay. Failure to comply with this rule may subject the owner to a fine of $150 per violation.

- <u>Outdoor Recreational and Social Activities.</u>  All outdoor recreational and social activities organized or participated in by owners, their family members, tenants and invitees in their yards or on their patios shall be conducted in an orderly and safe manner and with lighting and noise levels that will not unreasonably annoy other owners, tenants and invitees in the subdivision. The Board shall refer to Park City Code §6-3 as a guideline for issuing notices of violations under this provision. Failure to comply with this rule may subject the owner to a fine of up to $500 per violation.

- <u>Rentals by Owners.</u>   Any owner renting or leasing their residence or lot shall provide the Association or its designated manager a copy of a written lease or tenancy agreement at least three days prior to granting possession of the premises to their lessee or tenant. All leases or rentals of an Owner's Lot and its Improvements shall be for residential use only, and rental occupancy for parties, hospitality use, commercial use, or of a disruptive nature are prohibited. Each lease or tenancy agreement shall have attached an executed copy of an Addendum approved by the Association's Board. In connection with each such rental, the owner shall designate the person or entity that is responsible for the supervision or management of the activities of their tenants during the rental term along with contact information for such designated supervisor or manager who shall be immediately available for contact by the Association or its manager at any time before, during or after the rental term.  Any owner renting or leasing their residence shall provide a rental binder to their lessee or tenant containing a copy of the Governing Documents. Any Owner making short term rentals shall register for a business license as required by Park City Code §4-5-3 and provide proof that such registration is currently in effect.

- <u>Lot Maintenance and Wildfire Mitigation.</u> Owners shall maintain their lots in a safe, neat and well-tended condition, including, without limitation, the removal of noxious weeds as identified by Summit County at https://summitcounty.org/1221/Noxious-Weed-ID and in compliance with wildfire mitigation actions required by Park City Code §11-21-1.

- <u>Fines.</u> Fines levied against an Owner by the Association for violations of the Governing Documents shall comply with the provisions of §57-8-208 of the Utah Community Association Act. The Association may levy a fine of up to $100 per day for continuing violations of prohibited acts set forth in the Governing Documents.

# Exhibit C

Best,

Annie

Sent from my iPhone

On Jun 23, 2025, at 12:24 PM, Susan Shay <sshaypc@gmail.com> wrote:

Dear Annie and Ryan,

The American Flag HOA ARC has approved your landscaping plans.

Attached please find the Notification Verification letter for the city.

Best regards,

Susan Shay
Ptarmigan Property Services

On Mon, Jun 23, 2025 at 11:34 AM Ryan Jacob <rjacob@caeonline.com> wrote:

That is wonderful news, thank you Susan!

Ryan F. Jacob

Chairman and CEO

**CAE**

3

5201 Great America Parkway, Suite 320

Santa Clara, CA 95054

T:  650-326-3313

rjacob@caeonline.com

www.caeonline.com

---

**From:** Annie Jacob <jacobhouse429@gmail.com>
**Sent:** Monday, June 23, 2025 10:18 AM
**To:** Susan Shay <sshaypc@gmail.com>
**Cc:** Ryan Jacob <rjacob@caeonline.com>; Dylan McMurdie <dylan.mcmurdie@deermeadowslandscape.com>
**Subject:** Re: Landscaping

Awesome! Thank you  so much!

Best,

Annie

Sent from my iPhone

> On Jun 23, 2025, at 10:15 AM, Susan Shay <sshaypc@gmail.com> wrote:

4

Hi Annie,

I apologize for the delay in responding, Bret has been out of town.  He replied today with approval of your landscaping plans.  Once I hear back from the ARC, (should be today or tomorrow), I will email you the Notification Verification letter for the city.

Best regards,

Susan Shay

Ptarmigan Property Services

On Wed, Jun 18, 2025 at 5:54 PM Annie Jacob <jacobhouse429@gmail.com> wrote:

Hey Susan,

I just wanted to check in on this and make sure you guys didn't need anymore information from us or our landscape architect, Dylan.

Best,

Annie

5

Sent from my iPhone

On Jun 6, 2025, at 8:48 AM, Annie Jacob <jacobhouse429@gmail.com> wrote:

Of course

Best,

Annie

Sent from my iPhone

On Jun 5, 2025, at 12:46 PM, Susan Shay <sshaypc@gmail.com> wrote:

That's great, thank you very much for paying online!

Sent from my iPhone

On Jun 5, 2025, at 11:36 AM, Annie Jacob <jacobhouse429@gmail.com> wrote:

Susan,

I paid it online earlier today (screenshot below). Sorry, I thought we were switching to using this portal for Homeowners payments. Do I need to try to reverse it and mail a check, or can you guys access this payment online?

Best,

Annie

On Thu, Jun 5, 2025 at 12:08 PM Susan Shay <sshaypc@gmail.com> wrote:

Annie,

Bret has confirmed that his review fee is $500.

Please make check payable to:

American Flag HOA

and mail to me at:

Susan Shay

2724 Creek Dr.

Park City, UT  84060

Thank you!

On Wed, Jun 4, 2025 at 12:56 PM Annie Jacob <jacobhouse429@gmail.com> wrote:

Hi Susan,

Thank you so much, I really appreciate it! I have attached the HOA Plan of Submittal, as well as the landscape architect's design plan here. I have also forwarded the plans to Bret. Please let me know the best way to pay the fee, and if we are missing anything.

Best,

Annie

On Fri, May 30, 2025 at 9:19 AM Susan Shay <sshaypc@gmail.com> wrote:

Hi Annie,

Thank you for contacting me regarding your landscaping plans.  The HOA also requires the attached plan submittal.  Please fill it out and return to me.

The appointed architect is Bret Bullough, with Mammen Architects.  Please contact him with any questions:

bret@mammenarchitects.com

(801) 879-4866

Best regards,

Susan Shay

Ptarmigan Property Services

(435) 714-0353

On Mon, May 26, 2025 at 2:12 PM Annie Jacob <jacobhouse429@gmail.com> wrote:

Hey Susan,

Happy Memorial Day! I just wanted to double check that I was reading the bylaws correctly regarding redoing landscaping! The below is what I could find- submit a design from 4 different elevation views and a fee for the Architectural Committee to approve. I just wanted to make sure I wasn't missing an application

9

or something.

Best,

Annie

Sent from my iPhone

<Screenshot 2025-06-05 at 12.33.47 PM.png>

<429 Centennial.pdf>

# Exhibit D

| | |
|---|---|
| **From:** | Annie Jacob <jacobhouse429@gmail.com> |
| **Sent:** | Wednesday, August 6, 2025 1:38 PM |
| **To:** | Susan Shay |
| **Subject:** | Re: Landscaping |
| **Attachments:** | Flag Patio Sketch-compressed.pdf |

Hey Susan,

We love our new yard and how much we have been able to use it with the upgrades the HOA and city approved!! We love it so much, that we would like to add on!

Do have to file a whole new application and submit a new processing fee, or can we do an addendum to our previous plans/approval. Basically we are wanting to make a large retaining wall in the front for more grass and flat play space for the kids (much like the current retaining wall, but closer to the street), fence the sunken patio drops, create a small patio in the back, add an external shower, build a play house in a tree grove, and extend our grass. I have attached the plans below, but let me know if you need me to submit a whole new application!

1



# Exhibit E

On Tue, Aug 26, 2025 at 9:28 PM Jacob Family House Manager <jacobhouse429@gmail.com> wrote:

Hey Susan,

I'm so sorry for bombarding your email about our landscape project again, but I still have not heard from Bret. I know everyone is just coming back from summer and getting back in the groove of things, but we were hoping to get this project completed before the first snow. Our landscapers are also reaching the end of the tweaks we are making within the original plan (changing out stair material for a more cohesive color, removing gravel material for more grass, etc) and will soon have to move onto another project elsewhere. Is it possible to receive an approval for the amendment this week so that they can continue on our project? Or if there are questions or concerns that are holding up the process, we are more than happy to have a discussion and adjust!

Best,

Annie

Sent from my iPhone

> On Aug 23, 2025, at 12:24 PM, Jacob Family House Manager <jacobhouse429@gmail.com> wrote:
>
> Thank you so much!!
>
> Best,
>
> Annie
>
> Sent from my iPhone
>
>> On Aug 23, 2025, at 8:08 AM, Susan Shay <sshaypc@gmail.com> wrote:
>>
>> Hi Annie,
>> I have not heard from Bret, but forwarded him your messsge.
>> Susan
>>
>> Sent from my iPhone
>>
>>> On Aug 23, 2025, at 6:34 AM, Jacob Family House Manager <jacobhouse429@gmail.com> wrote:

2

Hey Susan,

Any updates? I haven't heard from Bret yet, and I know he mentioned he would be reviewing the plans last week.
Best,

Annie

Sent from my iPhone

> On Aug 15, 2025, at 11:14 PM, Annie Jacob <jacobhouse429@gmail.com> wrote:
>
> Sounds great! Please just let me know how much the additional fee is and I can submit it on the HOA portal (or any other way that is preferable)
>
> Best,
>
> Annie
>
> Sent from my iPhone
>
>> On Aug 15, 2025, at 7:55 AM, Susan Shay <sshaypc@gmail.com> wrote:
>>
>> Hi Annie,
>>
>> Bret emailed me that he will be reviewing your landscaping plans today. Please note that there will be an additional review fee.

3

All best,

Susan

On Wed, Aug 13, 2025 at 12:49 PM Annie Jacob <jacobhouse429@gmail.com> wrote:

Hey Susan,

Just wanted to check in on the below!

Best,

Annie

Sent from my iPhone

On Aug 6, 2025, at 1:38 PM, Annie Jacob <jacobhouse429@gmail.com> wrote:

4

# Exhibit F

Case 2:26-cv-00463-AMA-DAO    Document 1-1    Filed 05/20/26    PageID.80    Page 74 of 97

| | |
|---|---|
| **From:** | Susan Shay <sshaypc@gmail.com> |
| **Sent:** | Friday, August 29, 2025 8:04 AM |
| **To:** | Jacob Family House Manager |
| **Subject:** | Re: Landscaping |
| **Attachments:** | 429 Centennial 1.pdf |

Annie,

Good morning!  The HOA ARC has approved your landscaping plans with the suggestion of not having trees so close to your house with current and future fire restrictions.

Attached is the HOA letter for the city in case it needs to be updated.

Best of luck with your landscaping additions, it sure looks great!

Sincerely,

Susan Shay
Ptarmigan Property Services


On Thu, Aug 28, 2025 at 7:27 PM Jacob Family House Manager <jacobhouse429@gmail.com> wrote:
  Amazing! Thank you so much for moving this along for us Susan! We really appreciate it!! Let me ask them about the letter.

  Best,

  Annie

  Sent from my iPhone


        On Aug 28, 2025, at 3:21 PM, Susan Shay <sshaypc@gmail.com> wrote:


        Hi Annie,

        My apologies for the delay.  The architect has reviewed your plans, I am waiting to hear back from the ARC committee for approval.  In the meantime please let me know if you need an updated letter for the city.

        All best,

        Susan

        Susan

1

# Exhibit G



# HOMEOWNERS ASSOCIATION
# NOTIFICATION VERIFICATION

This document shall serve as verification that the _American Flag_
(Subdivision)

Homeowner's Association has been notified of _Annie Jacob's_
(Owner)

Intent to build at _429 Centennial Cr., Park City, UT 84060_
(Address)

This notice is only to inform the HOA that the owner is seeking a Building permit from Park City Municipal Corporation. These plans may change and it is the HOA's responsibility to follow the process if necessary.

— DOG RUN —

Check One:

☑ Notice received and acknowledged

_Susan C. Shay (signature)_                    13 NOV 25

HOA Representative Signature (must match registration on file)            Date

_Susan C. Shay_

HOA representative printed name

☐ Notice mailed and received

I hereby certify that I attempted to contact the HOA to execute the above acknowledgement and was unsuccessful. Attached is the signed return receipt of the certified letter which included a true and accurate copy of this notification.

_____(Owner signature and attach receipt)

# Exhibit H

January 5, 2026

Ryan and Anne Jacob
429 Centennial Circle
Park City, UT 84060

**Subject: Notice and Request for Removal re Playhouse Structure in Front Yard**

Dear Mr. and Mrs. Jacob:

On behalf of American Flag Homeowners Association ("AF HOA"), I am writing to request that you remove the stand-alone structure (a playhouse) in your front yard within 30 days of the date of this letter, or February 5, 2026.

Section 4.2 of the Declaration of Protective Covenants for American Flag Subdivision, dated June 12, 1980, provides that "no improvements of any kind … shall ever be erected … or permitted to remain on any lands within the Subdivision … unless the complete plan and specifications therefor are approved by the Architectural Committee prior to the commencement of such work."  Complete plans and specifications for the subject structure were never submitted to the AF HOA Architecture Committee, and the Committee never approved the structure.  In addition, Deer Valley Guideline 74, which applies to American Flag properties, does not allow free-standing buildings such as the playhouse.  The subject structure violates this guideline.

If you wish to relocate that playhouse to your backyard, you may apply to the Architecture Committee for such approval.  The Architecture Committee will decide whether to approve building the playhouse in your backyard.

Please be advised that if the playhouse is not removed within 30 days, AF HOA has the right to fine you for non-compliance.  AF HOA has determined that an appropriate fine will be $100 per day until the playhouse is removed.

We sincerely hope this situation will be rectified promptly and appreciate your anticipated cooperation.  Please contact me if you have any questions or want to discuss.

Sincerely,

Robert E. Boone III

President, American Flag HOA
310-487-6556
Reboone3d@gmail.com
**American Flag HOA**
P.O. Box 680820
Park City, UT 84060

# Exhibit I

On Jan 5, 2026, at 6:23 'a0PM, Ryan Jacob <rjacob@caeonline.com> wrote:

Dear Mrs. Shay, the American Flag HOA ARC, and Bob Boone:

Today, we received an e-mail and letter incorrectly informing us that our children's playhouse had not been approved by the American Flag HOA Architectural Committee (ARC).  This is demonstrably inaccurate.

Firstly, our family submitted a series of plans for the overhaul of our landscaping to the ARC.  Most relevant to the playhouse was an e-mail sent to Susan Shay, the HOA and ARC's authorized representative, on August 6th, 2025.

That letter's description of the plan is directly below, emphasis related to the playhouse has been added by me today:

*"Hey Susan,*

*We love our new yard and how much we have been able to use it with the upgrades the HOA and city approved!! We love it so much, that we would like to add on!*

*Do have to file a whole new application and submit a new processing fee, or can we do an addendum to our previous plans/approval. Basically we are wanting to make a large retaining wall in the front for more grass and flat play space for the kids (much like the current retaining wall, but closer to the street), fence the sunken patio drops, create a small patio in the back, add an external shower,* **build a play house in a tree grove***, and extend our grass. I have attached the plans below, but let me know if you need me to submit a whole new application!"*

Additionally, the below overview of the plan was provided, which shows the intended site of the playhouse, and the same site is labelled, "Playhouse Wayfair, Grey Gravel Pad." Denoting that this was a playhouse, its place of purchase (wayfar) and that it would be placed on a gravel area (which it was).



I have attached a further pdf of the plan's schematic, to assist in your more careful review of the wording. No questions about this plan were asked, no clarifying points came back from the ARC. The sufficiency of these plans was never contested by ARC or any other member or body of the HOA.

On August 29th, 2025, representing nearly **23 full calendar days of reviewing the plan**, the ARC, via Susan Shay, its authorized representative, responded, with the following:

*"From: Susan Shay <sshaypc@gmail.com>*
*Date: August 29, 2025 at 8:03:57 "a0AM MDT*
*To: Jacob Family House Manager <jacobhouse429@gmail.com>*
*Subject: Re: Landscaping*

*Annie,*

*Good morning!  The HOA ARC has approved your landscaping plans with the suggestion of not having trees so close to your house with current and future fire restrictions.*

*Attached is the HOA letter for the city in case it needs to be updated.*

*Best of luck with your landscaping additions, it sure looks great!*

*Sincerely,*

*Susan Shay*
*Ptarmigan Property Services"*

For your ease, I have also attached the letter referenced in Mrs. Shay's response on 8/29/2025.

It is in this context that we find your January 5th, 2026 letter to be puzzling and misguided.  Firstly, the HOA's bylaws are silent as to what constitutes "complete plans and specifications."  However, it is very clearly incumbent on the ARC to review plans, which it did for 23 days, determine their sufficiency, and approve or not approve them on that basis and their conformance with the bylaws and applicable regulations to its knowledge (e.g., knowledge of Deer Valley regulations that it clearly possessed when it decided to approve our plans).  The idea that the ARC could approve plans, and then nearly 6 months later reverse itself, after tens of thousands of incurred and paid expense, is simply inconsistent with the law.  Furthermore, any violation of Deer Valley restrictions, which were not cited in your letter specifically, would have arisen from ARC's approval, not our actions and you are not a party to matters between Deer Valley and our family, nor are we a party to any damages Deer Valley may seek against the HOA for approving our playhouse, in error, if that is what happened, should that unlikely event ever arise.  To be clear, the HOA was aware of those regulations when it approved our playhouse and its location.

In this case, our plans were approved without comment, amendment, or concern – this all happened well before construction of the playhouse began.  To put this simply: we found your letter to be factually inaccurate as to how this situation arose and is nothing more than an attempt to change decisions the HOA and ARC has already made, well outside of the authority of either.  We believe, if we are forced to move our playhouse (although we see no basis for that occurring), the HOA and ARC would be liable for considerable damages, which we would pursue.

To be frank, it seems clear to us that the ARC approved our plans, and regrets doing so, or failed its duties to properly analyze our plans.  That, unfortunately, does not provide a basis for reversing its decision.

Please note any attempt to fine our family, given the facts of how this situation has come to be, will be met with legal action.

Thank you for your note, and we very much wish we were not having this conversation with our neighbors and friends. However, this situation is entirely of the HOA's making.

Warmly,

Ryan and Annie

Ryan F. Jacob
Chairman and CEO
**CAE**
5201 Great America Parkway, Suite 320
Santa Clara, CA 95054
T:  650-326-3313
rjacob@caeonline.com
www.caeonline.com

# Exhibit J

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION

January 9, 2026

Ryan and Anne Jacob
429 Centennial Circle
Park City, UT 84060

**Subject: Notice and Request for Removal re Playhouse Structure in Front Yard**

Dear Mr. and Mrs. Jacob:

American Flag Homeowners Association ("AF HOA" or "the HOA") is in receipt of Ryan's January 5, 2026 email and carefully considered it.

Ryan's email does not change the HOA's position that the subject playhouse should be removed.

I am sending this letter on the HOA's behalf in an effort to reach a resolution of this dispute. Because this letter and its contents constitute a settlement communication, my communications are privileged, confidential and not admissible in any court or other proceeding pursuant to applicable rules of evidence. As part of the settlement communications contained herein, I will respond to various statements in Ryan's email.

I hope this dispute can be resolved quickly on the terms proposed below. If not, the situation could become uncomfortable between you and other homeowners in the neighborhood. In short, and regardless of the dispute over whether the HOA approved a playhouse in or about August 2025, homeowners have complained about the subject playhouse and its location in your front yard, and the subject playhouse, as installed, does not comply with the HOA's requirements or the Deer Valley Guidelines.

The HOA proposes as a resolution of this dispute the following terms:

(1) the HOA's Architecture Review Committee ("ARC") will approve installation of the subject playhouse (even though it does not comply with various requirements, as detailed below, and would never have been approved by the ARC) at a mutually agreeable location in your backyard;

(2) the HOA will pay the reasonable expenses for any required disassembly, transportation and/or reassembly of the subject playhouse in order to relocate it to the backyard as provided in (1) above, such expenses not to include any costs associated with re-landscaping the area where the playhouse is currently situated or to remedy any damage to your property from relocating the playhouse caused by any contractor or other person performing the relocation work; and

(3) you agree to exclude the subject playhouse from any sale of your property and remove the subject playhouse from the property upon transfer of title of the property to anyone, unless the HOA otherwise approves sale and transfer of title of the property with the playhouse to remain thereon.

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION

I believe the above settlement offer is reasonable in light of the existing circumstances, which support the HOA's position that it never approved a playhouse, but even if it did, such approval was unintentional and a mistake of fact, and there nevertheless exists valid grounds for removal of the subject playhouse.

Neither the HOA's architect nor any member of the HOA's Architecture Review Committee was aware of the playhouse when approving your landscaping plans, had no intention of approving the playhouse, and in fact did not approve a playhouse.

The Concept Plant Schedule document attached to Annie's email sent on August 6, 2025 is very low resolution and the area you say called out the playhouse is not legible.



The "Reference Notes Schedule" contained in the Concept Plant Schedule makes no mention of a playhouse. Rather, item 13, where you say the playhouse was placed, references "Decorative Stone Grey 4" Angled."

Even if the Concept Plant Schedule document was of sufficient resolution to read the alleged reference to a playhouse, that does not constitute sufficient information for seeking approval of the playhouse. Nor is it an adequate basis for approval of a playhouse, something your landscape designer should know. Moreover, there was no indication in the drawing or Annie's email that the playhouse was a physical structure to be affixed to the property. No elevation drawings were provided showing a playhouse structure. No drawings, photographs, cut sheets, design plans or specifications for the playhouse were submitted. No link to the particular model playhouse you selected, if in fact you had selected one as of that time, was provided. A search on Wayfair's website for "outdoor playhouse" yields over 300 items. Even assuming the architect or ARC

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION

members had known of a playhouse (they did not), none of them had sufficient information to approve the subject playhouse. Indeed, you did not provide any information to identify any particular playhouse, what it looks like, its dimensions, design or materials. Neither the HOA's architect nor the ARC approves items abstractly.

The next iteration of your landscaping plan received in October 2025 is legible, but it does not reference a playhouse. Instead, the plans you submitted only notes a decorative stone in the location where the playhouse was later installed.



You proposed in your October submission a temporary freestanding structure – a prefabricated bike storage unit – and submitted a photograph of that unit, evidencing that you and your landscape designer knew that more than a mere reference was required for approval of a structure, even a temporary one. The bike storage unit was rejected.

Your final submission received in November 2025 does not reference any playhouse and, in fact, completely omits the note of any material in the location where you installed the playhouse.

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION



In addition, the HOA's Declaration of Protective Covenants ("CCRs") and Deer Valley Guidelines, which do apply, are written in such a way that it is unreasonable for anyone to conclude that approval by the HOA of such a structure could be granted based on a mere reference (legible or not) in the Concept Plant Schedule document submitted in August or Annie's email.  For instance, Deer Valley Guidelines section 74 provides:

> Landscaping often includes outdoor structures (decks, trellises, gazebos, pergolas, greenhouses, play equipment).  These structures frequently detract from the overall appearance of the landscape by adding an element of visual disorder.  They should be designed to work as extensions of buildings, rather than as separate elements.  Free-standing elements should be avoided unless there is a compelling reason to have them.  In both cases, every effort must be made to give the site as a whole a common character, appropriate to the Deer Valley setting.  Outdoor structures will be judged on this basis.

Section 74 makes it clear that outdoor structures are disfavored, and there must be a *compelling* reason for a free-standing structure, such as the playhouse.  I am not aware of a compelling reason for the playhouse, particularly a playhouse situated in your front yard.

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION

Section 6.1 of the CCRs provides:  "No Building or structures shall be placed, erected, altered, or permitted to remain on any Lot other than one single family dwelling and one garage together with related nonresidential structures and improvements of the type described in Section 4.2 hereof."  The nonresidential structures and improvements described in Section 4.2 include "swimming pools, ponds, parking areas, fences, walls, tennis courts, garages, drives, antennae, flag poles, curbs and walks."  Playhouses are not mentioned.  Regardless, Section 4.2 requires the homeowner to submit "complete plans and specifications" for any improvement in order to obtain approval from the ARC.

Here, no such plans or specifications were ever submitted or approved.

Under Section 4.2, "no improvements of any kind… shall ever be erected, altered, or permitted to remain on any lands within the Subdivision … unless the complete plans and specifications therefor are approved by" the ARC.  Since you never complied with this requirement, and it was unreasonable to believe that the ARC had approved a playhouse without one iota of information regarding its design, you arguably never should have installed the playhouse and installed it at your own risk.

In any event, and assuming the HOA approved a playhouse (it did not), the subject playhouse you installed nevertheless violates the CCRs and the Deer Valley Guidelines. This alone provides adequate grounds under Section 4.2 to require removal of the playhouse.

Section 4.4 of the CCRs states:  "...all improvements, construction, landscaping and alterations on the lands within the subdivision conform and harmonize with the natural surroundings and within existing structures as to external design, materials, color, siting, height, topography, grade elevation keeping with the architectural guidelines."

The subject playhouse must, but does not, satisfy Section 4.4 for the following reasons:

1. The playhouse roof does not match the asphalt architectural shingles on the main house;
2. The base of the playhouse does not match the base and ledger of the main house;
3. The eaves of the playhouse are too small and do not harmonize with the design of the main house;
4. The eaves fascias do not match the main house and are not square; and
5. The roof slope of the playhouse is too shallow – the roof slope cannot be more shallow than 4.5:12.

In addition, the playhouse eaves and base do not comply with Deer Valley Guidelines. The base is not stone, as required, and the eaves are too shallow (less than three feet).

PRIVILEGED AND CONFIDENTIAL SETTLEMENT COMMUNICATION

Based on the foregoing, I think it is clear the ARC would not have approved the subject playhouse, even if you had complied with the CCRs and submitted the requisite detailed design plans and specifications.

Finally, I point out that, contrary to Ryan's email, this is not a situation where the ARC members are having "regrets" about approving a playhouse. They cannot have regrets when the notion of a playhouse never entered their minds in the first place while considering your landscaping plans. At best, you may be able to convince a trier-of-fact that the ARC or the HOA's architect committed an oversight, but under Utah law that does not negate the HOA's authority to revoke in good faith an approval based upon a mistake of fact or oversight, and/or require removal of an improvement that detracts from the neighborhood.

Perhaps a meeting in person to discuss the situation in more detail to see if we can resolve this matter is in order. I can meet with you at your convenience. I look forward to your response and anticipated cooperation.

Sincerely,

Robert E. Boone III

President, American Flag HOA
310-487-6556
Reboone3d@gmail.com
**American Flag HOA**
P.O. Box 680820
Park City, UT 84060

# Exhibit K

# American Flag Homeowners Association

## Homeowner Transaction History 1/1/2026 - 4/7/2026

### AF10704 - Ryan & Anne Jacob - 429 Centennial Cr 77

| Date | Description | Charge | Payment | Balance |
|---|---|---|---|---|
| | Prior Balance | - | - | $0.00 |
| 1/1/2026 | Annual Assessment | $500.00 | - | $500.00 |
| 1/1/2026 | Special Assessment | $1,000.00 | - | $1,500.00 |
| 1/5/2026 | ACH ...2391 | - | ($1,500.00) | $0.00 |
| 3/30/2026 | Compliance Fine Fine 2/4/26-3/30/26 | $5,500.00 | - | $5,500.00 |
| 3/31/2026 | Compliance Fine | $100.00 | - | $5,600.00 |
| 4/1/2026 | Compliance Fine  - | $100.00 | - | $5,700.00 |
| 4/2/2026 | Compliance Fine  - | $100.00 | - | $5,800.00 |
| 4/3/2026 | Compliance Fine  - | $100.00 | - | $5,900.00 |
| 4/4/2026 | Compliance Fine  - | $100.00 | - | $6,000.00 |
| 4/5/2026 | Compliance Fine  - | $100.00 | - | $6,100.00 |
| 4/5/2026 | ACH ...2391 | - | ($5,900.00) | $200.00 |
| 4/6/2026 | Compliance Fine  - | $100.00 | - | $300.00 |
| 4/7/2026 | Compliance Fine  - | $100.00 | - | $400.00 |

Robert S. Rosing (#14866)
Jared C. Bowman (#11199)
Cade W. Whitney (#16345)
**ROSING DAVIDSON FROST**
136 Heber Ave., Suite 205
Park City, Utah 84060
Telephone: (435) 731-5451
rosing@rosingdavidson.com
bowman@rosingdavidson.com
whitney@rosingdavidson.com
*Attorneys for Plaintiffs Ryan F. Jacob and Annie Jacob*

## IN THE THIRD JUDICIAL DISTRICT COURT
## IN AND FOR SUMMIT COUNTY, STATE OF UTAH

| | |
|---|---|
| **RYAN F. JACOB**, an individual, **ANNIE JACOB,** an individual, **RYAN F. JACOB & ANNIE JACOB AS REPRESENTATIVES OF G.J.**, as minor child. <br><br> Plaintiffs, <br><br> vs. <br><br> **AMERICAN FLAG HOMEOWNERS' ASSOCIATION,** A Utah non-profit corporation, <br><br> Defendant. | **21 DAY SUMMONS** <br><br> Case No: 260500183 <br><br> Judge Richard Mrazik <br><br> TIER III |

**TO THE ABOVE-NAMED DEFENDANT:**

      **AMERICAN FLAG HOMEOWNERS' ASSOCIATION**
      c/o Registered Agent, **PTARMIGAN PROPERTY SERVICES**
      2025 CANYONS RESORT DR
      PO BOX 680820
      Park City, UT, 84068, USA

    You are hereby summoned and required to file an Answer or other responsive pleading in writing to the attached Complaint with the clerk of the above-entitled court at the Third Judicial District Court, 6128 Paintbrush Road, Park City, UT 84098, and serve a copy of said Answer or

other responsive pleading upon Plaintiff's attorney located at 136 Heber Ave., Suite 205, Park City, Utah, 84060 within twenty-one (21) days after service of this Summons upon you.

If you fail to do so, judgment by default will be taken against you for the relief demanded in said Complaint, which has been filed with the Clerk of said Court and a copy of which is hereto annexed and herewith served upon you.

DATED this 10th day of April 2026.

**ROSING DAVIDSON FROST**

*/s/ Cade W. Whitney*
Robert S. Rosing
Jared C. Bowman
Cade W. Whitney
*Attorneys for Plaintiffs*

Bilingual Notice to Responding Party for In-State Summons (for compliance with URCP 4)

| | |
|---|---|
| A lawsuit has been filed against you. You must respond in writing by the deadline for the court to consider your side. The written response is called an Answer. | Se ha presentado una demanda en su contra. Si desea que el juez considere su lado, deberá presentar una respuesta por escrito dentro del periodo de tiempo establecido. La respuesta por escrito es conocida como la Respuesta. |

**Deadline!**
Your Answer must be filed with the court and served on the other party **within 21 days** of the date you were served with this Summons.

If you do not file and serve your Answer by the deadline, the other party can ask the court for a default judgment. A default judgment means the other party can get what they asked for, and you do not get the chance to tell your side of the story.

**¡Fecha límite para contestar!**
Su Respuesta debe ser presentada en el tribunal y también con la debida entrega formal a la otra parte **dentro de 21 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio.

Si usted no presenta una respuesta ni hace la entrega formal dentro del plazo establecido, la otra parte podrá pedirle al juez que asiente un fallo por incumplimiento. Un fallo por incumplimiento significa que la otra parte recibe lo que pidió, y usted no tendrá la oportunidad de decir su versión de los hechos.

**Read the complaint/petition**
The Complaint or Petition has been filed with the court and explains what the other party is asking for in their lawsuit. Read it carefully.

**Lea la demanda o petición**
La demanda o petición fue presentada en el tribunal y ésta explica lo que la otra parte pide. Léala cuidadosamente.

**Answer the complaint/petition**
You must file your Answer in writing with the court **within 21 days** of the date you were served with this Summons. You can find an Answer form on the court's website:
utcourts.gov/ans

Scan QR code to visit page

**Cómo responder a la demanda o petición**
Usted debe presentar su Respuesta por escrito en el tribunal **dentro de 21 días** a partir de la fecha en que usted recibió la entrega formal del Citatorio. Puede encontrar el formulario para la presentación de la Respuesta en la página del tribunal: utcourts.gov/ans-span



Para accesar esta página escanee el código QR

**Serve the Answer on the other party**
You must email, mail or hand deliver a copy of your Answer to the other party (or their attorney or licensed paralegal practitioner, if they have one) at the address shown at the top left corner of the first page of this Summons.

**Entrega formal de la respuesta a la otra parte**
Usted deberá enviar por correo electrónico, correo o entregar personalmente una copia de su Respuesta a la otra parte (o a su abogado o asistente legal, si tiene) a la dirección

Page **3** of **4**

| | |
|---|---|
| **Finding help**<br>The court's Finding Legal Help web page (utcourts.gov/help) provides information about the ways you can get legal help, including the Self-Help Center, reduced-fee attorneys, limited legal help and free legal clinics. <br>Scan QR code to visit page | localizada en la esquina izquierda superior de la primera hoja del citatorio.<br><br>**Cómo encontrar ayuda legal**<br>Para información sobre maneras de obtener ayuda legal, vea nuestra página de Internet Cómo Encontrar Ayuda Legal. Para accesar esta página escanee el código QR<br>(utcourts.gov/help-span)<br>Algunas maneras de obtener ayuda legal son por medio de una visita a un taller jurídico gratuito, o mediante el Centro de Ayuda. También hay ayuda legal a precios de descuento y consejo legal breve. |

## RETURN OF SERVICE

### IN THE THIRD JUDICIAL DISTRICT COURT OF THE STATE OF UTAH
### IN AND FOR THE COUNTY OF SUMMIT

Case Number: 260500183

Plaintiff: **RYAN F JACOB  et al**
**AMERICAN FLAG HOMEWNERS**
**ASSOCIATION ..**

Service Documents:
21 DAY SUMMONS ..Bilingual notice
..VERIFIED COMPLAINT AND JURY
DEMAND .EXHIBIT  A-K

For:
ROSING /DAVIDSON/FROST
136 HEBER AVENUE SUITE # 205
PARK CITY, UT 84060

Received by INTEGRATED  INVESTIGATORS on the 16th day of April, 2026 at 4:15 pm to be served on **AMERICAN FLAG HOMEOWNER'S ASSOCIATION c/o PTARMIGAN PROPERTY SERVICES, 2025 CANYONS RESORT DRIVE, PARK CITY, SUMMIT County, UT 84068.**

I, Julia Blair, do hereby affirm that on the **21st day of April, 2026 at 10:44 am, I:**

served an **AUTHORIZED** entity by delivering a true copy of the **21 DAY SUMMONS ..Bilingual notice ..VERIFIED COMPLAINT AND JURY DEMAND .EXHIBIT  A-K** with the date and hour of service endorsed thereon by me, to: **ALAN JOHNSON** as **AUTHORIZED TO ACCEPT** at the address of: **2724 CREEK DRIVE, PARK CITY, SUMMIT County, UT 84060**, who stated they are authorized to accept service for **AMERICAN FLAG HOMEOWNER'S ASSOCIATION**, and informed said person of the contents therein, in compliance with state statutes.

**Additional Information pertaining to this Service:**
4/21/2026  10:44 am  SERVED ALAN JOHNSON , MALE IN HIS 60'S CAUCASIAN , 5'7" 155 WEIGHT WITH WHITE HAIR , AUTHORIZED TO ACCEPT FOR " PTARMIGAN PROPERTY SERVICES " AT THE ADDRESS OF 2724 CREEK DRIVE , PARK CITY UT 84060 ..

I certify that I am over the age of 18, have no interest in the above action, and am a Certified Process Server, in good standing, in the judicial circuit in which the process was served. **I Declare under criminal penalty under the law of Utah that the foregoing is true and correct**

Julia Blair
private investigator #G2322651

**INTEGRATED  INVESTIGATORS**
**& CONSTABLE  SERVICES**
**P O BOX 902038**
**SANDY, UT 84090**
**(801) 523-5054**

Our Job Serial Number: JSS-2026000828
Ref: IVONNET

Copyright © 1992-2026 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a